EDWARD KOLAKOWSKI *et al.*, Plaintiffs-Appellants and Cross-Appellees, *v.* DR. DAVID C. VORIS *et al.*, Defendants-Appellees and Cross-Appellants.— (DR. LEONARD R. SMITH, Defendant-Appellee.)

First District (5th Division)    Nos. 78-2064, 79-300 cons.

Opinion filed March 20, 1981.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Perry L. Fuller and Dr. Kendall Griffith, of counsel), for appellants Dr. David C. Voris and Dr. K. S. Parameswar.

Walter M. Ketchum, Ltd., and William D. Maddux & Associates, both of Chicago (William J. Harte, of counsel), for appellees Edward Kolakowski and Clara Kolakowski.

French & Rogers, of Chicago (Richard G. French and Timothy G. Keating, of counsel), for appellee Dr. Leonard R. Smith.

Mr. JUSTICE WILSON delivered the opinion of the court:

Plaintiffs, Edward and Clara Kolakowski, filed this medical malpractice action against two neurosurgeons, Dr. David C. Voris and Dr. K. S. Parameswar, and an orthopedic surgeon, Dr. Leonard R. Smith.[1] A jury found all three doctors not liable for Edward Kolakowski's injuries. The trial court, having previously reserved ruling on Dr. Smith's motion for a directed verdict, then granted his motion. Subsequently, plaintiffs successfully moved the court to grant a new trial as to defendants Voris and Parameswar. Pursuant to Supreme Court Rule 306 (Ill. Rev. Stat. 1979, ch. 110A, par. 306), we granted the two neurosurgeons' petition for leave to appeal from that order. They contend on appeal that the trial court abused its discretion in granting the new trial. Plaintiffs cross-appeal from the trial court's order granting a directed verdict in favor of the orthopedic surgeon, Dr. Smith. For the reasons set forth herein, we affirm both of the trial court's orders.

This litigation has been pending since August of 1974 when plaintiffs filed their initial complaint. The record includes hundreds of pages of medical testimony, some of which we summarized in the prior appeal from defendant hospital's summary judgment. (*Kolakowski v. Voris* (1979), 76 Ill. App. 3d 453, 395 N.E.2d 6 *aff'd* (1980), 83 Ill. 2d 388, 415 N.E.2d 397.) Because we will focus on the legal standard for granting new trials and whether the trial court abused its discretion, we need not describe the evidence at length.

In the summer of 1973, Edward Kolakowski (plaintiff),[2] suffering severe pain in his left shoulder, entered Mercy Hospital for heat treatments. The pain persisted, however, and on August 15, 1973, Dr.

[1] The fourth defendant, Mercy Hospital and Medical Center, was granted a summary judgment prior to trial, and is not involved in this appeal. We reversed the summary judgment in *Kolakowski v. Voris* (1979), 76 Ill. App. 3d 453, 395 N.E.2d 6, *aff'd* (1980), 83 Ill. 2d 388, 415 N.E.2d 397.

[2] For clarity we will refer only to Edward Kolakowski as "plaintiff," although his wife, Clara, also seeks to recover damages from defendants, on a loss of consortium theory.

Parameswar performed a neurological examination of plaintiff and took a myelogram of plaintiff's spine. The myelogram indicated that there was a defect between two cervical discs in plaintiff's spine, which put pressure on the nerve root. Dr. Parameswar told plaintiff he could choose between continuing the conservative treatments or undergoing surgery. He described the two possible surgical approaches and explained the risks involved. Drs. Parameswar and Voris both recommended that plaintiff undergo an anterior disc removal and interbody fusion.

On August 24, 1973, Drs. Voris and Parameswar operated on plaintiff. After they had removed the defective disc from plaintiff's spine, Dr. Smith inserted a bone plug into the space, to fuse with the cervical vertebrae, and closed the wound. Following the surgery, plaintiff's condition was monitored at frequent intervals. The first indication of possible complications occurred at 6 p.m., approximately eight hours after the surgery, when plaintiff complained that his right arm was weak and numb. He also said that he could not bend his legs. A 7:30 p.m. notation indicated that plaintiff was "shaky" and had vomited. At 10:45 p.m., plaintiff had a temperature of 102°. He could bend his right leg slightly. Hospital personnel unsuccessfully attempted to reach Dr. Voris. Thereafter, plaintiff's condition apparently fluctuated. On August 26 he experienced spasms in his legs. At times there was some indication that he could bend his legs slightly, which would signify improvement. However, the doctors concluded that his recovery was not proceeding as expected. Accordingly, Dr. Voris ordered a second myelogram, which was performed on August 27. It revealed a complete obstruction between the sixth and seventh cervical vertebrae. Defendants immediately performed a decompressive laminectomy on plaintiff from the back of the neck. During this operation the doctors removed fragments of extruded disc material from the fifth and sixth cervical levels. The post-operative report stated that there was no evidence of spinal cord compression, and the cause of plaintiff's difficulties remained unknown. After this second operation, plaintiff was still unable to move his extremities. His condition was diagnosed as an impaired function of the cervical spinal cord.

Plaintiff received physical therapy and other treatment as an outpatient, but his pain continued, as did his limited ability to move his arms and legs. Gradually, however, plaintiff was able to assume some of the functions necessary for daily living. He could feed himself with his right hand. He could also walk around at home, although he needed his wheelchair or walker outside the home.

In 1976, plaintiff went to California to be examined by Dr. J. DeWitt Fox, who agreed to testify for plaintiff in the lawsuit pending against defendants. In October of 1977, he operated on plaintiff's back. After two operations, plaintiff was required to use a permanent catheter for the first

time. He also suffered a substantial loss of function in his deltoid muscle, causing his right arm to hang limply by his side.

At the trial, Dr. Fox testified as one of plaintiff's expert witnesses. He stated that his surgery was aimed at plaintiff's "original" problem rather than an attempt to correct anything the defendants had done. According to Dr. Fox, however, defendants' surgery had not conformed with the proper standard of care. Dr. Fox believed that plaintiff's problem was caused by disc fragments driven into the spinal cord and up against the nerve root at the time of the August 24, 1973, surgery. He hypothesized that defendants had failed to remove all disc fragments during the anterior dissectomy. Then, when Dr. Smith inserted the bone plug, disc material apparently was forced up against the spinal cord, causing the plaintiff's subsequent quadraparesis. Dr. Fox acknowledged, however, that the actual disc material that defendants found during the second operation could not have caused plaintiff's condition because of its location. He assumed that some disc fragments remained in the surgical site, and had been forced against the spinal cord. Regarding the matter of plaintiff's post-operative care, Dr. Fox testified that defendants should have undertaken immediate exploratory surgery on plaintiff following the first operation, rather than wait three days.[3]

Dr. Adolph Gerol, plaintiff's second expert, also stated his opinion that the defendants had deviated from proper surgical standards.

The two defendant neurosurgeons testified at length regarding the operations. They removed the defective disc and inspected the surgical site, finding no disc material. Because they initially operated from the front of the neck, they could not see the spinal canal and cord; this view was obstructed by the longitudinal ligament which forms a "curtain" in front of the spinal cord. The doctors testified that this ligament was intact, signifying that no disc fragments from the first operation could have penetrated it and thereby pass into the spinal canal to lodge against the spinal cord. Further, the doctors testified that during the second operation, performed from the back of plaintiff's neck, they found no disc fragments compressing the cord. The fragments they did find were in a location where they could not reach the spinal cord.

Dr. Smith, the orthopedic defendant, corroborated the neurosurgeons' testimony that the surgical site was clean before he inserted the bone plug to complete the first operation. The X rays of the surgical site revealed a complete and successful fusion.

The neurosurgeons suggested that, since the second exploratory operation indicated that there was no spinal cord damage (which apparently would have caused immediate physical symptoms), plaintiff's post-

---

[3] The record indicates that Dr. Fox stated in a deposition that he would have followed exactly the same course of post-operative care that Dr. Voris followed.

operative condition could have been caused by a blood clot which blocked the flow of blood to the spinal cord, causing plaintiff's pain. Such a condition, neither detected nor anticipated, would have developed in the hours following the surgery. Plaintiff's experts disagreed with this theory, stating that plaintiff's symptoms were inconsistent with the blood clot theory.

Defendants' expert witness, Dr. Oscar Sugar, testified that the surgeons had acted at all times in accordance with the proper standard of care and that plaintiff's condition was medically, surgically, and anatomically incapable of being caused in the manner suggested by plaintiff's experts. Dr. Sugar testified that the bone plug used in the fusion could not have produced such force as to drive disc material into the spinal cord, even if such material were present in the spinal canal at the time of the operation.

OPINION

I.

The trial court based its decision to grant plaintiff a new trial on two grounds: (1) the prejudicial closing argument of counsel for defendant Voris; and (2) the extensive cross-examination of Dr. Fox, which dwelt on his medical treatment of plaintiff. In urging us to reverse the trial court's order, defendants contend that the court used the wrong legal standard in assessing the alleged trial errors. They argue that error sufficient to precipitate a new trial must be, in effect, "reversible" error. In contrast, plaintiff would characterize the standard as "potentially prejudicial" error.

Before we discuss the two bases for the trial court's decision, we must evaluate defendants' view of the applicable law. They maintain that if a jury's verdict is not against the manifest weight of the evidence, the trial court errs in granting a new trial. By extension, they argue that a trial court's *only* proper basis for granting a new trial is that the verdict is clearly against the manifest weight of the evidence. In support of this proposition, they cite *Banwart v. Okesson* (1980), 83 Ill. App. 3d 222, 403 N.E.2d 1234. In *Banwart*, an appeal from the *denial* of a new trial, the court stated, "A motion for a new trial is properly denied if the verdict is not against the manifest weight of the evidence * * *." 83 Ill. App. 3d 222, 227, 403 N.E.2d 1234, 1238.

■■ However accurate this quotation may be, it does not necessarily follow that a motion for a new trial should *never* be granted as long as the verdict is supported by the evidence. The flaw in this proposition is that it ignores the other main reason for granting a new trial—that the jury's verdict was influenced by "passion or prejudice." (See *Torrez v. Raag* (1976), 43 Ill. App. 3d 779, 782, 357 N.E.2d 632.) It may well be, as defendants imply, that the likelihood of a court's finding error sufficiently

prejudicial to justify a new trial will increase where the facts are "close." Certainly, if evidence supporting a verdict seems overwhelming, some errors may be deemed harmless because of the probability that the jury decided the case on the evidence. (See, *e.g.*, *Houck v. Martin* (1980), 82 Ill. App. 3d 205, 402 N.E.2d 421 (trial court's definition of "loan," although unnecessary, did not cause reversible error because there was no indication that the jury was confused by it); *Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 398 N.E.2d 188 (various alleged errors, including remarks of counsel, did not amount to reversible error).) Conversely, if the case is so close on its facts that "the jury might have decided either way, any substantial error which might have tipped the scales in favor of the successful party calls for reversal." *Both v. Nelson* (1964), 31 Ill. 2d 511, 514, 202 N.E.2d 494, 496.[4]

That there may be a correlation between the weight of evidence in a particular case and the perceived magnitude of the trial errors, however, does not persuade us to adopt defendants' theory that a court must make a threshold "finding" that the evidence is close before it can evaluate the alleged errors. Indeed, this premise seemingly begs the question: it presupposes that *no* error will be deemed prejudicial unless the case is a "close" one. Such a notion has no basis in the law or in logic. When a new trial is ordered because of errors in the original proceedings, the court is concerned with the *fairness* of the judicial process. See *Alley v. Champion* (1979), 75 Ill. App. 3d 878, 394 N.E.2d 735 (net effect of errors was that the jury's attention was diverted from the chief issue of liability on the facts, which deprived plaintiff of a fair trial).

■■ ■ Further, we must emphasize the distinction between the trial court's discretion in granting a new trial and the appellate court's more limited power of review. It is true that both the trial court and the appellate court owe great deference to a jury's determination of contested factual issues. As we stated in *Torrez v. Raag* (1976), 43 Ill. App. 3d 779, 782, 357 N.E.2d 632, 634, "Jury determinations can be set aside only when the trial court is clearly satisfied that they were occasioned by passion or prejudice or found to be wholly unwarranted from the manifest weight of the evidence." Consequently, when a post-trial motion for a new trial is made, on grounds of trial error, the trial judge must determine, from his own observations, whether the verdict was tainted by "passion or prejudice." The appellate court, in reviewing this decision, must not reverse it absent a clear abuse of discretion, affirmatively shown. (*Magnani v. Trogi* (1966), 70 Ill. App. 2d 216, 220, 218 N.E.2d 21, 23-24.) While there must be "some error" appearing in the record as the grounds for a new trial, the trial court is in the superior position to weigh the effect of

---

[4] Significantly, *Houck*, *Crump*, and *Both* were not appeals from orders granting new trials. Instead, they involved the reviewing court's power to reverse judgments.

such error on the jury. (*Turner v. Commonwealth Edison Co.* (1976), 35 Ill. App. 3d 331, 341 N.E.2d 488 (appellate court affirmed order granting new trial because it had not found the record to be free from all "potentially prejudicial error" and could not say the trial judge had abused his discretion).) Therefore, in reviewing the record and the briefs of counsel, we must accord proper deference to the trial court's assessment of the errors.

Guided by these general principles we next consider the trial court's specific reasons for granting a new trial in this case. The court held,

> "Because of the improper argument of counsel for Voris and Parameswar, the court's failure to caution counsel or to instruct the jury to specifically disregard the argument, and the court's error in permitting testimony indicating malpractice on the part of Fox in his treatment subsequent to the original treatment to relieve the conditions flowing from defendants' surgery, and argument based on such testimony, the court finds that it must grant the plaintiff's motion for a new trial."

The challenged portion of defense counsel's closing argument follows:

> "Mr. Fuller: But if this jury as a cross-section of this community is going to respond to this type of evidence and this type of case and subscribe to the Dr. Foxes and Dr. Gerols and ignore and cast aside the clear and convincing evidence of Dr. Sugar, if that's the state of the art, no neurosurgeon can be asked to assume such risks again.
>
> Mr. Maddux: Objection, your Honor. That's an improper argument.
>
> Mr. Fuller: It's not improper at all, Counsel.
>
> The Court: I'll sustain the objection. Objection sustained.
>
> Mr. Fuller: There is no way that this jury can impose the burden of all surgical risks on the surgeon and keep surgeons working.
>
> Mr. Maddux: I make the same objection. It's an improper argument.
>
> The Court: Objection sustained.
>
> Mr. Fuller: These solutions to human ailments are developing and growing; knowledge is increasing. You can't set it back."

The trial court agreed with plaintiff that *Panelle v. Chicago Transit Authority* (1964), 31 Ill. 2d 560, 202 N.E.2d 484, and *Torrez v. Raag* support the contention that this argument is improper and entitles plaintiff to a new trial. In *Panelle,* the attorney for the defendant municipal corporation alluded to other claims asserted against defendant and its ability to pay the claims. Plaintiff's objection to the remarks was sustained, but the court did not instruct the jury to disregard them. The

Illinois Supreme Court upheld the order granting a new trial, noting that the trial court was in the superior position to appraise the effect of the remarks.

In *Torrez*, a medical malpractice action, defendant's attorney began to comment on the adverse affects the lawsuit would have upon his client's reputation and his ability to practice medicine. The lawyer's remarks were interrupted by an objection, which was sustained. After the jury returned a verdict for defendant physician, the court granted plaintiff's motion for a new trial, taking into account the weight of the evidence, the attitude and demeanor of the witnesses and the closing arguments of counsel. The appellate court affirmed the new trial order, noting that although plaintiff's objection was sustained and she had failed to move for a mistrial, the defense counsel's remarks had injected a prejudicial element into the case. *Torrez*, 43 Ill. App. 3d 779, 783, 357 N.E.2d 632, 635.

■■ In the pending case, the trial court found these cases persuasive. The court further noted that defense counsel had persisted in his line of argument, despite two objections. In addition, the challenged remarks were made toward the end of the closing argument and "stood without specific admonishment by the court." We cannot say the court clearly abused its discretion in determining that the remarks were prejudicial. The comments imply that the effect of a verdict favoring plaintiff would be the imposition of every conceivable surgical risk upon surgeons, which would force them out of work. This injects an improper element into the case, which could have influenced the jury.

We need not determine whether the improper remarks could constitute the *sole* basis for granting a new trial, however, because the trial court clearly based its decision on the effect of the closing arguments in conjunction with other errors.

The second major reason the trial court cited for its order involves the testimony of Dr. Fox, plaintiff's expert. In essence, the trial judge decided that the cross-examination of Dr. Fox and the arguments based thereon confused the jury because of the implication that Dr. Fox might have committed malpractice during his treatment of plaintiff. The court stated that it "permitted such testimony because the Court at the time felt that the defendants could not be held responsible for the injuries that flowed from that surgery." The court acknowledged, however, that it had erred in this respect because "Illinois case law and well-settled court law hold that one who receives an injury that is aggravated by the malpractice of a physician is entitled to recover not only for the original injury but for any aggravation of the original injury caused by a later physician's malpractice flowing from the original injury."

The confusion over this issue centers on Dr. Fox' role in this

litigation. Defendants had made a motion *in limine* to limit him to testifying as an expert witness and thus to exclude his testimony regarding plaintiff's subjective complaints. Plaintiff objected and the court denied defendant's motion. Consequently, Dr. Fox was also permitted to testify as a treating physician. At one point his testimony indicated that his surgery was aimed at remedying plaintiff's nerve root problem, which was part of plaintiff's original condition, and not at correcting defendants' surgery. He also testified, however, that the purpose of his surgery was to alleviate plaintiff's pain. This excruciating pain, plaintiff argues, was caused by defendants' negligent surgery. As an apparent result of Dr. Fox' surgery, plaintiff lost the use of his right arm and was required for the first time to use a permanent indwelling catheter for his bladder problems.

■■ The evidence regarding Dr. Fox' treatment may have shifted the jury's attention away from the separate question of defendants' liability. Because of the emphasis on Dr. Fox' treatment, the jury might have begun to perceive of Dr. Fox as the "guilty" party. Defendants' counsel argued to the jury that Dr. Fox' surgery "produced nothing but a deficit for Mr. Kolakowski" and that "the tragedy in this case" was that plaintiff would have the jury believe that defendants were responsible for the effects of Dr. Fox' surgery. In view of the trial court's admitted misconception of the aggravation of injuries principle, we cannot say that Dr. Fox' testimony and the attendant arguments could not have produced error. As the trial court realized during the post-trial hearing, a person who is injured through another's negligence can recover from the original tortfeasor not only for the original injury but also for any aggravation of that injury caused by a physician's subsequent malpractice, assuming that the injured party exercised ordinary care in selecting the physician. *Gertz v. Campbell* (1973), 55 Ill. 2d 84, 302 N.E.2d 40.

Defendants contend, however, that this rule only involves the policy against mitigation of a tortfeasor's *damages* for the subsequent aggravation of plaintiff's injuries.[5] Because the jurors found no liability, they did not reach the damages issue and therefore the cross-examination of Dr. Fox could not have prejudiced plaintiff. Moreover, defendants contend that since plaintiff raised the matter of Dr. Fox' surgery on direct examination and urged the court to allow his testimony as a treating physician, plaintiff cannot now object to defendants' responsive cross-

---

[5] To support their argument that allegations of error concerning the extent of damages are generally not a basis for reversal where the jury found the defendants not liable and therefore had no reason to consider the question of damages, defendants cite *Mulvey v. Illinois Bell Telephone Co.* (1973), 53 Ill. 2d 591, 294 N.E.2d 689. The *Mulvey* court recognized, however, that in some cases, errors concerning the extent of damages may be "so pervasive and prejudicial as to create the likelihood that they may have affected a jury's decision on the issue of liability." We believe this may be such a case.

examination. In addition, defendants argue that the results of Dr. Fox' surgery were properly brought out for the purpose of pinpointing weaknesses in his testimony and demonstrating possible bias.

We agree that defendants had the right to cross-examine Dr. Fox regarding his treatment of plaintiff and to impeach his credibility. We do not believe the trial court intended to imply that evidence of Dr. Fox' treatment was irrelevant or inadmissible. We believe, however, that the trial judge's admitted confusion over the applicable law concerning the subsequent aggravation of a party's injuries is more than a minor technicality; it underscores the likelihood that the jury was also confused as to the applicable law. If the jury perceived Dr. Fox as a wrongdoer it may have acquitted the defendants on that basis. Notwithstanding defendants' contention that the evidence was overwhelmingly in their favor, we reiterate that in ruling on a motion for a new trial, the court must try to ensure that the verdict was not infected by improper and prejudicial elements. The crucial point that the trial judge implicitly recognized is that, had he not misconceived the pertinent law, the trial might have taken a different course. It is quite possible that different jury instructions would have been given.[6] We hesitate to override the trial judge's decision to correct its own errors in these circumstances.

As a final consideration we note that the trial judge was greatly concerned with making a reasoned decision in this matter. He reviewed the extensive briefs and arguments of counsel and also conducted his own research of the law. We conclude that he did not abuse his discretion in granting plaintiff a new trial.

## II

We next consider plaintiff's cross-appeal from the order granting Dr. Smith's motion for a directed verdict. Under the pertinent standard, judgment for Dr. Smith should not have been entered unless all the evidence, when viewed most favorably to the plaintiff, so overwhelmingly favored Dr. Smith that no contrary verdict could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 224 N.E.2d 504.[7]

■■ After reviewing the record we cannot agree with plaintiff that there was sufficient evidence against Dr. Smith to preclude the court from directing the verdict. Initially, we note that Dr. Smith's responsibilities as the orthopedic surgeon are distinguishable from the duties of the two neurosurgeons. (See *Burrow v. Widder* (1977), 52 Ill. App. 3d 1017, 368

---

[6] We note that the court refused defendants' instruction that would have raised the aggravation of injuries question. The judge rejected it, noting that it interjected the issue of contributory negligence, presumably regarding plaintiff's selection of Dr. Fox.

[7] Unlike a motion for a new trial, directed verdicts require a "more nearly conclusive evidentiary situation" than does a new trial. *Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 310, 356 N.E.2d 32, 35, citing *Pedrick*; see also *Jardine v. Rubloff* (1978), 73 Ill. 2d 31, 382 N.E.2d 232.

N.E.2d 443.) Drs. Voris and Parameswar removed the disc and were responsible for clearing the operating site. Dr. Smith's participation in the operation was limited to inserting the bone dowel into place. Therefore, his liability to plaintiff depends on the evidence relating to his standard of care as an orthopedic surgeon and any indication that he breached the standard, causing plaintiff's injuries.

Plaintiff's entire case against Dr. Smith consists of a few statements by Drs. Fox and Gerol that we believe fail to establish that Dr. Smith breached any standard of care. Dr. Fox testified that if disc fragments were in the surgical site, Dr. Smith deviated from the standard of care in inserting the bone dowel.

This supposition is unsupported by any evidence in the record. In fact, four people who were present during the August 24, 1973, operation—Drs. Smith, Voris, Parameswar, and an anesthesiologist—testified that they did not observe any disc fragments in the operating site. This testimony was not rebutted. As Dr. Fox conceded, an orthopedic surgeon who knows that neurosurgeons have prepared the site and who sees for himself that the site appears clean has a right to rely on the thoroughness of the neurosurgeon's preparation of that site. Moreover, as Dr. Fox further admitted, on cross-examination, even if disc fragments were present but in a location where they were not visible to Dr. Smith, he could proceed with his part of the operation, relying on the neurosurgeons, and still be conforming to good medical practice.

Dr. Gerol, plaintiff's rebuttal witness, did not add any substance to the allegations against Dr. Smith. He admitted, ultimately, that he had *no* opinion as to whether Dr. Smith breached any standard of care, although he stated that he, personally, would not rely on neurosurgeons in such an operation. Instead, he would demand assurances from the neurosurgeons that they had removed the disc material.

We believe that the testimony of Drs. Fox and Gerol clearly falls short of establishing that Dr. Smith deviated from any standard of care. The record reveals that his part of the operation, the bone fusion, was completed successfully. Notwithstanding plaintiff's theory that disc fragments were driven into his spinal cord where Dr. Smith inserted the bone plug, plaintiff's experts essentially admitted that he could rely on the neurosurgeons' preparation of the operation site. We therefore conclude that plaintiff did not establish a *prima facie* case of professional negligence against Dr. Smith, and the verdict was properly directed in his favor. See *Burrow v. Widder*.

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

LORENZ and MEJDA, JJ., concur.