# VIRGINIA NOLAN CARTER & another[1] vs. ROBERT L. SHIRLEY.

Middlesex. December 12, 1985. — January 23, 1986.

Present: GREANEY, C.J., GRANT, & PERRETTA, JJ.

*Practice, Civil,* Instructions to jury. *Negligence,* Doctor, Successive tortfeasors.

Where, in an action against an obstetrician for malpractice in diagnosing and treating a condition occurring as the result of the birth of the plaintiff's first child, there was conflicting evidence as to the defendant's negligence, conflicting evidence as to the negligence of a second doctor who performed surgery to correct the plaintiff's condition, and conflicting evidence as to whether the plaintiff's injuries were caused by the defendant's treatment or by the surgery, there was reversible error in the judge's refusal to instruct the jury, as requested by plaintiff's counsel, that if found negligent the defendant could also be found responsible for any additional injury caused by the negligence of the doctor who performed the surgery. [510-512]

CIVIL ACTION commenced in the Superior Court Department on April 30, 1980.

The case was tried before *James J. Nixon,* J.

*Judith Farris Bowman* for the plaintiffs.

*Nancy L. Watson* for the defendant.

GREANEY, C.J. In her malpractice claim, the plaintiff alleged that the defendant, an obstetrician-gynecologist, had negligently diagnosed and treated a condition occurring as the result of the birth of her first child. The condition allegedly led to a fistula in ano[2] which a second doctor repaired through surgery.

---

[1] The plaintiff's husband brought a claim for loss of consortium.

[2] A fistula is an abnormal passage running between the surface of the body and an organ, or between one organ and another. A fistula in ano is a particular type of fistula in which one opening of the fistula is in the perineum (a structure of muscle and fat between the vagina and anus) and the other is in the anus, the lower end of the rectum. The expert witnesses

The surgery, however, was not entirely successful. At trial, before a jury in the Superior Court, experts testified on both sides of the question of malpractice. The jury found for the defendant. We reverse the judgment because of the trial judge's failure to instruct the jury, over the timely request and specific objection of the plaintiff's counsel, that, if found negligent, the defendant could also be found responsible for any additional injury caused by the doctor who performed the surgery.

1. *Background facts.* On May 7, 1977, about 8:00 A.M., the plaintiff was admitted to Boston Hospital for Women, Lying-In Division, under the defendant's care for the birth of her first child. After over twelve hours of labor, the baby was about to be born. The defendant placed forceps around the baby's head and pulled gently. He also performed an episiotomy to prevent a perineal tear.[3] The defendant applied the forceps again and enlarged the episiotomy. He made a third cut just under the perineal skin after inserting the forceps a third time. Despite these precautionary measures, the plaintiff's perineum tore to the anoderm[4] as the baby's head was delivered. (The degree of the tear was a major issue at trial: the plaintiff and her expert stated that it was a fourth-degree laceration [a deep tear involving a rupture of the sphincter and the underlying mucous membranes of the rectum], while the defendant and his experts maintained that there was only a second-degree laceration [that is, a tear at the skin and subcutaneous levels].)

The area remained swollen and purplish for a week after the plaintiff returned home. Almost a month later, she observed two holes that drained shiny, then murky, fluid from her perineum. The defendant saw these holes during two office visits, treated them with silver nitrate, and recommended estrogen cream and sitz baths. The condition did not improve. On the plaintiff's third postpartum visit in July, 1977, the defendant

testifying at the trial used various terms at different times. Specifically, the plaintiff's condition was frequently referred to as a "perianal" fistula.

[3] An episiotomy is a common surgical procedure in deliveries that entails making an incision in the bottom of the vagina or perineum to prevent uncontrolled tearing of the mother's skin if the baby's head is too large for the vulvar orifice.

[4] The anoderm is the skin at the entrance to the anus.

diagnosed a fistula in ano and, according to the plaintiff, offered to unroof it[5] in his office. The defendant claimed that the plaintiff declined the procedure, and he told her not to let the condition go untreated for more than two months.

The plaintiff sought a second opinion from Dr. Marvin Corman, a colorectal surgeon, who indicated that sitz baths would not heal the fistula and agreed that it had to be excised by surgery. The plaintiff then went to Dr. Donald P. Goldstein, an obstetrician-gynecologist, and selected him to perform the surgery. The operation was performed on August 31, 1977. Immediately after the surgery, Dr. Goldstein informed the plaintiff that he had encountered a small abscess[6] at the midpoint of the fistula that necessitated cutting a portion of her sphincter muscle. Dr. Goldstein advised the plaintiff that, as a result, she might be troubled by incontinence and that she might require further surgery. The prognosis of incontinence was accurate.[7]

*The medical evidence*. Dr. Elizabeth L. Wilder, an obstetrician-gynecologist practicing in California, testified as an expert for the plaintiff.[8] She testified that she first examined the plaintiff in July, 1979. She found the plaintiff's perineal tissue very thin, observed a scar from her vagina to her anus, and felt a lack of rectal muscle. She stated these findings were consistent with the history provided by the plaintiff. Dr. Wilder further testified that the plaintiff had suffered a fourth-degree laceration that had not been recognized or repaired by the defendant. She based her opinion on the fact that a rectoperineal fistula had

[5] Unroofing consists of cutting the fistula open to allow drainage.

[6] An abscess is a pocket of infection.

[7] The plaintiff healed well, but by October, 1977, was experiencing bowel incontinence. She testified that she remains partially incontinent although the condition varies from better to worse. She is completely incontinent of gas, which is socially embarrassing. Her husband testified that his wife's difficulties have led to a loss of marital closeness. Apparently, surgery to correct the condition poses the risk of more serious injury, including total bowel incontinence. She has declined further surgery because of its risks.

[8] Dr. Wilder's testimony was presented to the jury by means of videotape. See Mass.R.Civ.P. 30A, inserted by 382 Mass. 824 (1980).

formed,[9] concluding that this type of fistula most likely occurs when an opening in the rectum caused by a fourth-degree laceration allows fecal matter and bacteria to pass from the rectum upward into the surrounding tissues, resulting in chronic infection and abscess. She also based her opinion on the fact that the skin incision was described as running from the introitus (opening of the vagina) to the anus. She stated that "it's highly unlikely that that would have occurred in the absence of the severing of the tissue behind that." She testified that, because plaintiff had no history of predisposing illnesses (including Crohn's disease), a likely cause of the fistula was an untreated fourth-degree laceration. Her conclusions were based on the history she took from the plaintiff (in which the plaintiff told Dr. Wilder that she had suffered a fourth-degree laceration) and her independent examination. Dr. Wilder concluded that the defendant had rendered substandard care when he failed to diagnose and treat a fourth-degree laceration. This neglect, in her opinion, caused the fistula that necessitated the operation that rendered the plaintiff incontinent.

Dr. Wilder also testified that the plaintiff's continued post-partum drainage might also have indicated a subskin infection that the defendant should have probed, drained and treated with antibiotics. In Dr. Wilder's opinion, the defendant's failure to undertake such treatment promptly was substandard and might also account for the formation of the fistula. Dr. Wilder testified that Dr. Goldstein had performed the surgery to repair the fistula competently.

Dr. Goldstein testified that the plaintiff had a fistula in ano,[10] and he described the surgery he performed to unroof it, including the cutting of the sphincter to remove the abscess. A written history taken from the plaintiff was introduced in evidence without objection. There, Dr. Goldstein recorded that the plaintiff had suffered a fourth-degree laceration. The plaintiff testified that she never told Dr. Goldstein that she had suffered a

[9] This testimony was apparently based on the assumption that the fistula was a rectoperineal fistula (between the rectum and the perineum).

[10] Dr. Goldstein used the term "perineal-rectal" in some of his testimony describing the fistula, but clarified that he meant fistula in ano.

fourth-degree laceration. Dr. Goldstein testified, however, that that conclusion was not based on clinical information gathered from his examination of the plaintiff but on what the plaintiff had told him. He also related his opinion that the fistula was "somehow" related to the birth but ultimately concluded that the relationship was only "temporal."

Dr. Marvin Corman testified as an expert for the defendant. He maintained that he had found no clinical evidence of a fourth-degree laceration when he examined the plaintiff on August 22, 1977. He stated that a vaginorectal fistula, not a fistula in ano, was a result to be expected from a fourth-degree laceration. He concluded that the temporal proximity of the fistula's development to the birth was coincidental and that the care provided to the plaintiff by the defendant had met acceptable medical standards.

Dr. Corman also testified that the plaintiff's incontinence had been caused not by the defendant, but by Dr. Goldstein's misdiagnosis and treatment of the fistula. He indicated that the operation Dr. Goldstein performed had been unnecessarily radical. Dr. Corman also found it unacceptable that Dr. Goldstein cut the sphincter and did not immediately repair it. He maintained that, if the plaintiff had suffered an unrepaired fourth-degree laceration in giving birth, she would have become incontinent immediately. He therefore concluded that her incontinence had been caused by Dr. Goldstein, not by the defendant.[11]

*Instructions to the jury.* In light of Dr. Corman's testimony that Dr. Goldstein, not the defendant, was responsible for the

[11] The defendant testified as an expert on his own behalf. He indicated that he had observed and repaired a second-degree laceration that the plaintiff had suffered at the time of birth, that his treatment of her draining sinuses was standard, and that, over-all, he had provided the plaintiff with acceptable medical care.

Dr. I. John Davis, an obstetrician-gynecologist, also testified as an expert for the defense. Based on his examination of the plaintiff's medical records, he concluded that the type of fistula which affected the plaintiff "has never happened in the history of the world" as a result of an unrepaired fourth-degree laceration. He also indicated that the anoderm could tear without rupturing the underlying muscles because the skin was less elastic than those muscles. He concluded that the defendant's care had been proper.

plaintiff's incontinence, the plaintiff made a timely request, see Mass.R.Civ.P. 51(b), 365 Mass. 816 (1974), for the following jury instruction:

> "If the defendant's negligent conduct causes the plaintiff to be treated by a physician wisely chosen by the plaintiff and if the physician is negligent in his therapy, such professional malpractice is not an intervening cause and the defendant is liable for the effects of the malpractice. *Gray* v. *Boston Elevated Railway,* 215 Mass. 143, 147-148 (1913)."

The judge denied the request and instead instructed the jury on the topic of causation as follows:[12]

> "There's one other matter which you might be — might come to consider I think should be mentioned to you:
>
> "[1] In your deliberations, I would suggest to you that you first must determine whether Doctor Shirley was negligent and breached any duty which he owed to her in the delivery and the episiotomy, and the condition, as to whatever you may find that was, after the delivery of the child. If you find that the doctor at that time was not negligent, if you were to find that there was no fourth degree laceration, and if you were to find that the doctor did everything that was reasonably expected of him to do in accordance with the conduct and behavior that would be expected of an obstetrician in the similar circumstance that he found himself in, then once you have found that he was not negligent in that, you go no further; you make a finding for the defendant and return to the courtroom.
>
> "[2] If you find that after the delivery and after the episiotomy there was a condition which should have been recognized and repaired, and that the doctor negligently

[12] The instructions on causation were preceded by proper instruction on the duty of care owed by a physician to his patient. See *Brune* v. *Belinkoff,* 354 Mass. 102, 109 (1968).

failed to note that, and that subsequently brought about the growth of a fistula, and if the doctor who treated her finally, treated something other than what existed, Doctor Shirley is not liable for those damages.

"[3] But if you find that he didn't treat something; he didn't take care of a condition, whatever condition you find existed, and that created the fistula; that he either misdiagnosed it or had intended — considered doing a procedure which wasn't appropriate, but that the doctor ultimately who did the — the repair determined the accurate thing, and he did the right thing, he treated the right thing — now if that chain is there all along, that it resulted from a failure at the time of the birth, and then it developed into a fistula, and then the repairing physician — if I may use that term — did it the way he should have, but there was a risk, and that risk, obviously from the testimony you've heard, was realized if she had been made incontinent as a result of those, chain of events, you may look to Doctor Shirley for all of those damages.

"[4] But if you found that the final, ultimate treatment was either not treating something that occurred as a result of a negligent act, or if you found that it didn't come about as a result of any negligence of Doctor Shirley; if it was something that just came on the person from another source, or even just from the source of the trauma, but that wasn't incurred as a result of a negligent act by the doctor, you would find for the defendant doctor.

"[5] So if you in your deliberations make the finding that this entire scenario of events is all — stems back and follows, step by step, and is related to a negligent act on the part of Doctor Shirley then you have a full gateway to assess damages for all of her pain and suffering and injury, present and future. But that must be based upon that chain of events which you find started initially back with the negligent act."

(The bracketed numbers will be referred to in later discussion).

At the conclusion of the charge, there was a specific objection made to the judge's failure to instruct the jury in accordance with the principles stated in the *Gray* v. *Boston Elev. Ry.*, 215 Mass. 143 (1913), decision. The renewed request was denied. The jury returned a general verdict for the defendant.

2. The evidence in the case would have permitted the jury to reach one of three possible results. The first would have involved a finding that the defendant had rendered proper care and was, therefore, not negligent at all. This situation was covered by the instruction in [1] above.[13] The second would have resulted in a finding that the defendant had been negligent but that Dr. Goldstein had rendered competent care that had led to an unfortunate result. This possibility was adequately explained by the instruction in [3] above.

The third result open to the jury on the evidence would have involved a finding that the defendant had been negligent and that his negligence required the plaintiff to see Dr. Goldstein, who in turn rendered substandard care. This is the situation in which the principle set forth in the *Gray* case would have applied. "The law is well settled that, in an action of tort for negligence causing bodily injury, the negligence of a physician, properly chosen, in treating that injury does not destroy the causal connection between that injury and the consequent suffering, even so much of the suffering as arises from the negligent treatment and would not have arisen if the injury had been properly treated." *Sacchetti* v. *Springer,* 303 Mass. 480, 481 (1939), and cases cited. See also *Selby* v. *Kuhns,* 345 Mass. 600, 602-603 (1963); *Glicklich* v. *Spievack,* 16 Mass. App. Ct. 488, 497 (1983); Restatement (Second) of Torts § 457 (1965). Prosser & Keeton, Torts 309-310 (5th ed. 1984). We see no reason why the rule should not apply to physicians whose original negligence causes the intervention of a second physician who either improperly diagnoses the case and performs an unnecessary operation or makes a proper diagnosis and

[13] This situation would, of course, cover a finding where the jury concluded that Dr. Goldstein's treatment was the sole cause of the plaintiff's present condition.

performs a necessary operation negligently.[14] See *Fish* v. *Los Angeles Dodgers Baseball Club,* 56 Cal. App. 3d 620, 639 (1976); *Kiniry* v. *Danbury Hosp.,* 183 Conn. 448, 455 (1981); *Cokas* v. *Perkins,* 252 F. Supp. 563, 565 (D.D.C. 1966); *Kolakowski* v. *Voris,* 94 Ill. App. 3d 404, 412 (1981); *Corbett* v. *Clarke,* 187 Va. 222, 224-225 (1948); *Lindquist* v. *Dengel,* 92 Wash. 2d 257, 262 (1979).

The judge's instruction did not cover this third situation. In fact, instruction [2] appears to state the exact reverse of the *Gray* principle and could reasonably have been interpreted by the jury as indicating that the law would not hold the defendant liable for any treatment furnished by Dr. Goldstein, negligent or otherwise, even if the defendant himself were to be found negligent. The instruction in [5] did not rectify the situation: it was correct as a general proposition but failed to circumvent the question addressed by the *Gray* case because instruction [5] focused on the treatment rendered by the defendant, not by Dr. Goldstein.[15] The fundamental difficulty lies in the judge's

[14] This is so because the principle expressed by the *Gray* case and § 457 of the Restatement (Second) does not focus on the identity or profession of the original tortfeasor. Rather, the principle focuses on the subsequent negligence of the second actor and deems it a foreseeable risk of the primary negligence so that the original tortfeasor may be held responsible for it, at least in circumstances like those in this case. See Restatement (Second), *supra,* comment b and illustration 1. In *Harrington* v. *Cohen,* 6 Mass. App. Ct. 205, 208 (1978), we acknowledged the propriety of imposing liability on a physician in accordance with the rule stated in Restatement (Second) § 457 (1965), but found the rule inapplicable in that case because the second medical procedure was not necessitated by anything which had happened in the first procedure.

[15] The instruction in [1] did not save the case. If a special verdict or a general verdict accompanied by answers to interrogatories had been used, as provided for by Mass.R.Civ.P. 49, 365 Mass. 812 (1974), it would be possible to say that the jury's negative answer to a question whether the defendant had been negligent rendered inconsequential any error in the later instructions on causation. See *Pemberton* v. *Boas,* 13 Mass. App. Ct. 1015, 1017 (1982). We cannot tell in this case whether the jury found that the defendant was not negligent or whether they found him negligent but concluded, based on the faulty instructions on causation, that his negligence had been superseded by negligence on Dr. Goldstein's part.

The instruction in [4] appears to add very little to the whole picture and, so far as we can discern, repeats in somewhat different words the instruction in [1].

failure to explain clearly to the jury, at any point, one of the principal theories in the case. That theory would have allowed recovery on findings by the jury that the defendant had been negligent, that, as a result, the plaintiff had sought further treatment from Dr. Goldstein, and that the defendant was responsible for any further injury whether or not Dr. Goldstein was negligent.[16]

3. The issues likely to arise at retrial can be dealt with briefly.

(a) Although it appears that the defense did not advise the plaintiff in their answers to interrogatories of Dr. Corman's opinion that Dr. Goldstein had been negligent, the judge's ruling that the testimony could be admitted may well find support in the unrecorded discussions with counsel concerning the problem. Moreover, the decision to admit Dr. Corman's opinion despite the plaintiff's claim of unfair surprise would be a discretionary one, see *Washington Hosp. Center* v. *Cheeks,* 394 F.2d 964, 965-966 (D.C. Cir. 1968), and in any event, the plaintiff cannot now realistically argue surprise as a new trial has been ordered. The testimony may be admitted at the retrial.

(b) The exclusion of that part of Dr. Wilder's opinion testimony that depended on an unproved fact attributed to Dr. Goldstein was proper. The other excluded material should have been admitted, as it was based either on observations made by Dr. Wilder or on facts in evidence.

[16] The defendant raised at oral argument the contention that his motion for a directed verdict under Mass.R.Civ.P. 50(a), 365 Mass. 814 (1974), should have been allowed on the basis that Dr. Wilder's testimony rested on conjecture. The contention was not argued in the defendant's brief. We consider it, nevertheless, because it is an argument which, if found valid, would sustain the judgment.

We conclude, however, that Dr. Wilder's expert testimony recited previously in this opinion was sufficient to take the plaintiff's case to the jury on one of two theories of negligence: that the defendant had either failed to diagnose and properly treat a fourth-degree laceration, or that he had failed to treat properly an infection that had occurred shortly after the birth, and that one or the other of those acts had led to the formation of the fistula which necessitated the surgery performed by Dr. Goldstein.

(c) The other evidentiary rulings complained of by the plaintiff excluded unimportant material. The rulings appear proper.

*Judgment reversed.*