CHERYL HOLLEMAN *vs.* JAMES M. GIBBONS.

No. 88-P-129.

Middlesex. February 14, 1989. — July 17, 1989.

Present: PERRETTA, SMITH, & WARNER, JJ.

*Practice, Civil,* Appeal, Record, Instructions to jury. *Rules of Appellate Procedure. Medical Malpractice,* Standard of care. *Negligence,* Medical Malpractice, Successive tortfeasors. *Proximate Cause. Damages,* Mitigation.

Where the transcript of the trial of a civil action was critical to a consideration of the issue presented for review, and the appellant's failure to include the transcript in her record appendix appeared to be the result of counsel's misinterpretation of procedural rules, rather than any lack of attention or diligence, this court granted her petition for rehearing and treated the transcript, which had been filed with the petition, as properly before it. [566-568]

In a malpractice action against an orthopedic surgeon alleging that, as a result of his negligent care of the plaintiff after he performed surgery on her foot, the plaintiff had required prolonged treatment from the date of the August, 1981, surgery through April, 1982, including the application and removal of several casts, the last of which was applied negligently on March 25, 1982, by a hospital cast technician, resulting in the plaintiff's suffering from peroneal nerve palsy in her foot, it was error for the judge to instruct the jury that they were to eliminate from their consideration whether the defendant had been negligent with respect to the "events prior to March of 1982," where the plaintiff's experts had testified that the cast of March 25 would not have been necessary but for the postoperative treatment rendered by the defendant. [568-570]

At the trial of a medical malpractice action against an orthopedic surgeon in which the defendant offered evidence that the plaintiff had entered a settlement with the hospital that employed the cast technician who negligently applied the plaintiff's cast, the judge did not err in allowing the jury to learn that the plaintiff had received $20,000 from the hospital as a result of the act of its employee. [570]

CIVIL ACTION commenced in the Superior Court Department on April 30, 1984.

The case was tried before *Hiller B. Zobel*, J.

*Richard P. Howe* for the plaintiff.

*John D. Cassidy* for the defendant.

PERRETTA, J. In this action for medical malpractice, the plaintiff alleged that the defendant, an orthopedic surgeon, had negligently failed to immobilize her right foot following an osteotomy of the second metatarsal bone of her right foot while also encouraging her to place partial weight on that foot when walking. This negligence, her claim continues, delayed the healing of her bone, required prolonged treatment from the date of the August, 1981, surgery through April, 1982, including the application and removal of several casts, the last of which was applied on March 25 by a hospital cast technician. Application of that last cast was done negligently. As a result, the plaintiff suffers from peroneal nerve palsy in her foot. The judge ruled that there was insufficient evidence to show that the doctor's treatment of the plaintiff up to March 25, even if negligent, was the proximate cause of her palsy. In instructing the jury, the judge limited their consideration of the issue of negligence to the doctor's treatment of the plaintiff as of March 25 forward. On the plaintiff's appeal, we reverse.

I. *The Evidence.*

We relate the evidence in a light most favorable to the plaintiff. The doctor performed the osteotomy on the plaintiff on August 18, 1981. As explained by one of the plaintiff's experts, an orthopedic surgeon, an osteotomy is a division of the bone to alter its angulation or configuration. The division is the equivalent of a fracture. The bone here altered, the second metatarsal, is a tubular bone that leads to the second toe. The expert characterized the second metatarsal as a "weight-bearing bone."

Because the purpose of an osteotomy is to alter angulation, the bone needs to be held firmly, or immobilized, in the corrected position until there is a union of the division. There are several methods of "fixation": (1) pins, screws, or other "immobilizing devices"; (2) altering the shape of the ends of the divided bone so that they fit into each other; (3) cast immobilization; or (4) pins supplemented by a cast.

According to the plaintiff, the defendant dressed her foot and wrapped it with an Ace bandage following the surgery. During her hospitalization and at the time of her discharge, the defendant instructed her to walk with crutches and put partial weight on her right foot. When she saw the defendant on August 23, and September 3,[1] she complained of pain and swelling in the foot. On those visits, the defendant instructed the plaintiff to continue wearing the foot bandage and walking with the crutches with partial weight placement on the right foot.

On October 5, the plaintiff again saw the defendant. After X-rays of her foot revealed that a union of the bone had not yet occurred, he applied a cast, which was removed for purposes of X-rays on October 13 and November 5. On that latter date, the defendant told the plaintiff that the bone had healed and that she was fine.

From November 5 until the end of that month, the plaintiff walked without crutches and with full weight on her foot. However, from late November and up through mid-February, the plaintiff's "foot became more painful the longer . . . [she] was on it and it began to swell." She returned to the defendant on February 25. X-rays revealed a nonunion of the bone division and a cast was again applied. The plaintiff then experienced no pain in her foot, and she returned to the defendant on March 25 for X-rays. Those X-rays revealed that the division had not healed.[2]

---

[1] The plaintiff saw the defendant on that date because her incision had opened. There was an infection in the surgical wound which he treated, apparently without incident.

[2] Although expert witnesses for the plaintiff and the defendant spoke in terms of union and nonunion, one of the defendant's experts, an orthopedic surgeon, stated that the term "non-union" meant more than a division. He defined the term as a "pathological condition in which the healing process has stopped. Nature has, so to speak, turned off the healing switch, and no further healing will take place unless some intervention is allowed to occur, such as electrical stimulation, or an operation where one inserts a bone graft to help nature turn on the healing switch." For purposes of our decision, any incorrect usage of the term nonunion is unimportant. The significant point for the plaintiff is that her foot was not immobilized throughout the period of the division in her bone.

Because of a medical emergency which required his presence, the defendant could not reapply the cast. He instructed the plaintiff to go to the hospital with which he was affiliated where a cast technician would apply the cast. The cast applied by the technician, who had previously set one of the plaintiff's several casts, appeared to the plaintiff to be longer than usual, coming up almost to her knee. It chafed against the back of her knee and caused her general discomfort.

Within a day or two of the application of her new cast, the plaintiff began to experience numbness, tingling, and a jumping sensation in her foot. As these sensations intensified, she reported them to the defendant. Because of her symptoms, the defendant removed the cast on March 29. The plaintiff had no control over her foot, and she felt numbness and tingling from her knees to her toes. When the defendant removed the cast on March 29, the technician who had applied it was present. The plaintiff testified that the defendant told the technician, "'[T]his is what can happen when a cast is put on wrong.'"

Both the plaintiff's experts, the orthopedic surgeon and a neurologist, testified that in their opinions the plaintiff's peroneal nerve palsy was caused by pressure on the peroneal nerve from the cast misapplied on March 25. The orthopedic surgeon also testified, however, that the defendant departed from the standard of care expected of the average orthopedic surgeon by failing to immobilize the plaintiff's bone throughout the healing period and permitting partial weight placement on the foot without immobilization. As set by the defendant's expert, the average healing time is twelve weeks, although healing can occur in some instances before twelve weeks and in other cases, it may take up to fifteen to eighteen weeks.

II. *Petition For Rehearing.*

We originally affirmed this judgment (see 26 Mass. App. Ct. 1121 [1988]) because of an inadequate record appendix. We had been provided with only four pages of the transcript: the judge's jury instruction in dispute and counsel's objection. The correctness of the instruction could not be considered without review of the evidence in its entirety. Citing to Mass.R.A.P. 8(b)(1), and 18(a) and (b), all as amended, 378

Mass. 932, 940-941 (1979), we summarily affirmed the judgment.

Promptly thereafter, the plaintiff filed a petition for rehearing pursuant to Mass.R.A.P. 27(a), as amended, 396 Mass. 1218-1219 (1986), accompanied by three copies of the four-volume trial transcript. We granted the petition and heard argument on the appeal for the following reasons. As explained by counsel in the petition, he had timely ordered and filed the transcript in accordance with rule 8(b)(1). In preparing the record appendix, he did not include the trial transcript in reliance upon the last sentence of the first paragraph of rule 18(b): "In designating parts of the record for inclusion in the appendix, the parties shall have regard for the fact that the entire record is always available to the court for reference and examination and shall not engage in unnecessary designation."

Although the transcript is part of the record on appeal in civil and criminal cases, see rule 8(a), as amended, 378 Mass. 932 (1979), it is not transmitted to us in civil cases by the clerk of the trial court as in criminal cases. See Mass.R.A.P. 9(d), as amended, 378 Mass. 936 (1979). In civil cases, we receive the trial transcript only if the parties have included it, or portions thereof, in the record appendix prepared in accordance with rule 18(b). Because the transcript is not transmitted to us by the trial clerk, its inclusion in the record appendix cannot be regarded as unnecessary. For the reason stated in *Kunen* v. *First Agricultural Natl. Bank*, 6 Mass. App. Ct. 684, 690 (1978),[3] inclusion is imperative and mandatory unless dispensed with pursuant to rule 18(f), 365 Mass. 867 (1974). The term "unnecessary designation" comprehends inclusion of items in the record appendix which are thought to be either irrelevant or at least tangential to the issues intended to be presented for review. Upon consideration of the appeal, should the court find it necessary to consider a part of the record inadvertently omitted from the record appendix or not included because thought immaterial by the parties, we may (but need

---

[3] "[M]uch of the time spent by the Justices in perusing briefs and appendices in preparation for oral argument is during hours when original records are physically unavailable."

not) then avail ourselves of the last sentence of the first paragraph of rule 18(b). Compare *Searcy* v. *Paul*, 20 Mass. App. Ct. 134, 148 (1985).

In the instant case, the transcript is critical rather than unnecessary to the issue presented for review. However, the failure to include it in the record appendix is the result of an erroneous interpretation of the procedural rules, which were otherwise complied with in all respects, rather than the product of negligence or a lack of attention and diligence. Compare *Kunen* v. *First Agricultural Natl. Bank*, 6 Mass App. Ct. at 689; *Iverson* v. *Board of Appeals of Dedham*, 14 Mass. App. Ct. 951, 951-952 (1982). The appeal brings before us an issue meriting review (cf. *Tisei* v. *Building Inspector of Marlborough*, 3 Mass. App. Ct. 377, 379 [1975]) which is possible without undue delay, *Kunen*, *supra* at 690, or prejudice to the defendant, who also referred to the transcript in his brief. Compare *Iverson*, *supra* at 952. In view of these circumstances, we deemed it appropriate to depart from our "practice of declining to look at parts of records which have not been reproduced in appendices . . . ." *Kunen* v. *First Agricultural Natl. Bank*, 6 Mass. App. Ct. at 690-691.

III. *The Jury Instruction.*

As earlier mentioned, the judge instructed the jury that they were to eliminate from their consideration whether the defendant had been negligent with respect to the "events prior to March of 1982." More specifically, they were to look at "March 25th, 26th, 27th, and 28th." On the evidence presented, that instruction limited the jury's consideration of the defendant's conduct to whether he had been negligent in allowing the technician to apply the cast on March 25th and in not removing that cast more promptly upon the plaintiff's complaints and symptoms. When the plaintiff objected to the instruction on the basis that the "issue of causation and proximate cause has not been completely addressed" in respect to the defendant's conduct leading up to the final cast, the judge ruled: "[T]here was no sufficient evidence that any negligence other than the negligence, if there was negligence, in March of 1982, was a proximate cause of the injury."

This instruction was in effect, if not in form, a directed verdict on the claim concerning the defendant's conduct from August 18, 1981, up to March 25, 1982. See Mass.R.Civ.P. 50(a), 365 Mass. 814 (1974). It is the plaintiff's contention that the instruction erroneously precluded the jury from considering whether the defendant was negligent in his postoperative treatment of her, thereby necessitating her treatment on March 25. Put another way, had the defendant immobilized her bone with a cast and allowed the cast to remain on throughout the healing process, she would not have needed the further treatment which caused her palsy.

For support of her claim, the plaintiff relies upon *Gray* v. *Boston Elev. Ry.*, 215 Mass. 143, 147-148 (1913), as applied in *Carter* v. *Shirley*, 21 Mass. App. Ct. 503, 510-511 (1986). In *Gray* the court held: "If an honest mistake is made by a doctor wisely selected, that is regarded as one of the incidents of the tortious act of the defendant. . . . Lack of skill on the part of a physician so chosen is not an independent and disconnected act, but is one which rationally may be attributed to the original tort of the defendant." In *Carter*, the court stated: "We see no reason why the rule should not apply to physicians whose original negligence causes the intervention of a second physician who either improperly diagnoses the case and performs an unnecessary operation or makes a proper diagnosis and performs a necessary operation negligently. See *Fish* v. *Los Angeles Dodgers Baseball Club*, 56 Cal. App. 3d 620, 639 (1976); *Kiniry* v. *Danbury Hosp.*, 183 Conn. 448, 455 (1981); *Cokas* v. *Perkins*, 252 F. Supp. 563, 565 (D.D.C. 1966); *Kolakowski* v. *Voris*, 94 Ill. App. 3d 404, 412 (1981); *Corbett* v. *Clarke*, 187 Va. 222, 224-225 (1948); *Lindquist* v. *Dengel*, 92 Wash. 2d 257, 262 (1979)." (Footnote omitted.) See also Restatement (Second) of Torts § 457 (1965); Prosser & Keeton, Torts 309-310 (5th ed. 1984).

To escape the implications of *Gray* and *Carter*, the defendant argues that there is a "total absence of expert testimony tying . . . [the defendant's] treatment in August, September, October, or November, 1981, with the placement of the cast on March 25, 1982. Neither . . . [of the plaintiff's experts] testified that

but for the treatment provided by . . . [the defendant] in 1981, the cast would not have been necessary. Without such testimony, the plaintiff cannot come within the holdings of *Gray* and *Carter*." Reviewed, as it must be, in a light most favorable to the plaintiff, we think the exact import of the experts' testimony is that the cast of March 25 would not have been necessary but for the postoperative treatment rendered by the defendant.

On the evidence presented, the defendant's treatment of the plaintiff from August 18 forward should have been put to the jury with appropriate instructions concerning causation and intervening cause.[4] See *Stamas* v. *Fanning*, 345 Mass. 73, 76 (1962); *Zezuski* v. *Jenny Mfg. Co.*, 363 Mass. 324, 327 (1973). Compare *Upham's Case*, 245 Mass. 31, 33-34 (1923). See generally Prosser & Keeton, Torts 319-321. It was error not to do so, and there must be a new trial.

IV. *Issue Likely to Recur*.

It is likely that, at any retrial, the defendant will again offer in evidence the fact of the plaintiff's settlement with the hospital that employed the cast technician. The judge did not err in allowing the jury to learn that the plaintiff had received $20,000 from the hospital as a result of the act of its employee. See *Tritsch* v. *Boston Edison Co.*, 363 Mass. 179, 182-183 (1973).

*Judgment reversed.*

---

[4] Although the judge did instruct briefly on intervening cause, he did not do so in respect to the defendant and the cast technician. Rather, he identified the intervening cause as the plaintiff's insertion of a cotton bandage between the back of her knee and the top of the cast of March 25 to relieve the chafing.