STATE OF NORTH CAROLINA v. EMMETT W. HOSEY

No. 154PA86

(Filed 7 October 1986)

**1. Criminal Law § 88.1— leading questions—cross-examination in form only**

    The purpose of the qualification "ordinarily" used in N.C.G.S. § 8C-1, Rule 611(c) is to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact. Further, the authority to sustain objections to leading questions directed to friendly witnesses in such situations is inherent in the discretion granted the trial court in Rule 611(a) to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . make the interrogation and presentation effective for the ascertainment of the truth."

**2. Criminal Law § 88.1— limiting leading questions on cross-examination—failure to make findings and conclusions**

    While the better practice would have been for the trial court to make findings and conclusions and declare formally that the witness was friendly to the party cross-examining her or adverse to the party calling her as a witness before limiting the use of leading questions on cross-examination of the witness, it was not reversible error for the court to limit leading questions on cross-examination without conducting a *voir dire* hearing or making any formal declaration when the record on appeal manifestly shows that the witness was only ostensibly the witness of the party calling her and was entirely friendly to the party cross-examining her.

**3. Criminal Law § 88.1— limiting leading questions on cross-examination—friendly witness**

    Defendant's right to cross-examine the State's witnesses was not denied when the trial court sustained the State's objections to leading questions dur-

ing defendant's cross-examination of his wife, a witness called by the State, where the witness sought whenever possible to make her testimony helpful to defendant and adverse to the State's case against him, and defendant was thus engaged in cross-examination in form only and not in fact. Further, any possible error in this regard was rendered harmless because defendant had the opportunity to establish any material fact he sought to elicit by simply rephrasing his questions to the witness.

ON writ of certiorari to review the decision of the Court of Appeals, 79 N.C. App. 196, 339 S.E. 2d 414 (1986), finding no error in the judgment entered by *Long, J.,* at the 3 December 1984 Criminal Session of Superior Court, SURRY County. The defendant was indicted for one count of rape and one count of incest. He entered pleas of not guilty. The jury found the defendant guilty of second degree rape and incest. The defendant received consecutive sentences of twelve years imprisonment for the rape conviction and four and one-half years imprisonment for the incest conviction.

The defendant appealed to the Court of Appeals which found no error. The Supreme Court allowed the defendant's petition for writ of certiorari on 7 April 1986. Heard in the Supreme Court on 8 September 1986.

*Lacy H. Thornburg, Attorney General, by Cathy J. Rosenthal, Associate Attorney, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by David W. Dorey, Assistant Appellate Defender, for the defendant appellant.*

MITCHELL, Justice.

The defendant makes four assignments of error on appeal. He first contends the trial court erred in sustaining the State's objections to leading questions during the defendant's cross-examination of a witness called by the State. Next, the defendant contends he was denied a fair trial because the State improperly insinuated that he had engaged in criminal acts additional to those charged against him. Third, the defendant contends the trial court wrongly denied his motion to dismiss the rape charge for lack of substantial evidence. Finally, the defendant contends the trial court plainly erred by including a statement which was not supported by the evidence in its summation to the jury. These contentions are without merit.

The State's evidence tended to show that the defendant, Emmett Hosey, was married to Martha Hosey. He was the stepfather to her three children from her former marriage, including the victim,[1] a female who was thirteen years old at the time of the crimes charged. Mrs. Hosey and her children began living with the defendant in 1976. On numerous occasions since the victim was about nine years old, the defendant would enter her bedroom at night and feel her breasts and genitals.

From 26 September to 6 October 1981, Mrs. Hosey was hospitalized for a possible heart condition. She arranged for her children to stay with their natural father until she came home. At that time the Hoseys and the children lived in a mobile home near another mobile home where the victim's natural father, Mrs. Hosey's ex-husband, lived.

On or about 1 October 1981, the victim was preparing to visit her mother in the hospital. The hot water heater in her father's mobile home was broken, so she went home to shower. The defendant was visiting in the victim's father's mobile home.

The victim had just stepped out of the shower when the defendant entered the bathroom and told her to get up against the sink. He started rubbing against her and touching her breasts and genitals. The defendant told the victim to go into the bedroom and lie down on his bed. She did so. Her stepfather followed, pulled down his pants, and began rubbing his penis against her genitals.

A noise startled the defendant. He ordered the victim to go to her room, lie down on the bed, and not come out. She did go to her room, but dried off and began dressing. There was no door in the doorway entering her room.

The victim heard her stepfather lock the outside door of the mobile home. He entered her room naked, pushed her down onto the bed and began rubbing against her and kissing her. He pulled

---

1. Use of the victim's name in this opinion is not necessary to distinguish her from other individuals involved in the case and would add nothing of value. Therefore, in keeping with the practice established by this Court in numerous recent cases, her name has been deleted throughout this opinion to avoid further embarrassment. *See, e.g., State v. Acklin,* 317 N.C. 677, 346 S.E. 2d 481 (1986); *State v. Artis,* 316 N.C. 507, 342 S.E. 2d 847 (1986); *State v. Price,* 313 N.C. 297, 327 S.E. 2d 863 (1985); *State v. Maccia,* 311 N.C. 222, 316 S.E. 2d 241 (1984).

her legs apart, keeping them open with his knees. The defendant held her arms at the wrists and penetrated her vagina. The victim said he "went up and down" on her "three or four times" and it hurt. She screamed, "Please stop, just stop!" Lifting her leg from under the defendant, she kicked him in the stomach. She was crying.

The defendant left, but returned to tell the victim that if she said anything to her mother he would beat her up or kill her. These threats scared her. Moreover, the victim was afraid of her stepfather because he had shown her a penitentiary where he said he had served time for shooting a man.

Several witnesses at trial described the victim as shy. Her mother said that if "you fuss in front of her, you do anything in front of her, she is nervous and she will cry, and it scares her."

The defendant also told the victim that if she "ever wanted to do it again" to tell him, and they would tell her mother they were going to ride around and they would park somewhere. About six months after the attack, the defendant began entering the victim's room at night and touching her breasts and genitals.

On 8 May 1984, the victim told her mother of these incidents. Her mother said the victim should yell for her and hit Mr. Hosey with the vacuum cleaner if he touched her again. That very night, the victim yelled for her mother. Mrs. Hosey saw the defendant as he left the victim's room but did not confront him.

The defendant first contends his right to cross-examine the State's witnesses was denied when the trial court sustained the State's objections to leading questions during the defendant's cross-examination of his wife, a witness called by the State. We disagree.

"[T]he North Carolina Rules of Evidence follow the traditional view that the use of leading questions is a matter of right during cross-examination." *State v. Mitchell,* 317 N.C. 661, 668, 346 S.E. 2d 458, 462 (1986). On the other hand, during direct examination the use of leading questions generally is not approved but may be allowed in the sound discretion of the trial court. N.C.G.S. § 8C-1, Rule 611(a) and (c) (Cum. Supp. 1985). *See State v. Greene,* 285 N.C. 482, 492, 206 S.E. 2d 229, 235 (1974).

Rule 611 of the North Carolina Rules of Evidence provides in pertinent part:

RULE 611. MODE AND ORDER OF INTERROGATION
AND PRESENTATION

(a) Control by the Court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth. . . .

. . . .

(c) Leading Questions. Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. Ordinarily leading questions should be permitted on cross-examination.

N.C.G.S. § 8C-1, Rule 611 (Cum. Supp. 1985).

Leading questions usually are not permitted on direct examination because of the danger that they will suggest the desired reply to an eager and friendly witness. In effect, lawyers could testify, their testimony punctuated only by an occasional "yes" or "no" answer. "The rule prohibiting leading questions is not based on a technical distinction between direct examination or cross-examination, but on the alleged friendliness existing between counsel and his witness." *State v. Greene*, 285 N.C. at 492, 206 S.E. 2d at 235 (decided before the enactment of the North Carolina Rules of Evidence, N.C.G.S. 8C-1). Therefore, the trial court should consider the true relationship between the interrogator and witness in ruling on the propriety of leading questions during either direct examination or cross-examination of the witness.

Cross-examination of an adverse witness is a matter of right, but the scope of cross-examination is subject to appropriate control by the court. *See Chambers v. Mississippi*, 410 U.S. 284, 35 L.Ed. 2d 297 (1973). The right of a cross-examiner to employ leading questions is not absolute. *See, e.g., Ardoin v. J. Ray McDermott and Co., Inc.*, 684 F. 2d 335 (5th Cir., 1982); *Morvant v. Construction Aggregates Corporation*, 570 F. 2d 626 (6th Cir.), *cert. dismissed*, 439 U.S. 801, 58 L.Ed. 2d 94 (1978); *Mitchell v. U.S.*, 213 F. 2d 951 (9th Cir.) *cert. denied*, 348 U.S. 912, 99 L.Ed.

715 (1955) (not error to limit defendant's questioning of friendly prosecution witness to non-leading questions).

In this case, the State called Martha Hosey who is the victim's mother and the defendant's wife. A review of the entire transcript of her testimony clearly shows that she sought wherever possible to make her testimony helpful to the defendant and adverse to the State's case against him. Her unwillingness to give testimony favorable to the State was revealed *inter alia* by her contentiousness during her examination by the prosecutor. For example:

Q. Did you hear Emmitt make any response to the effect that's a lie or hear him say anything like that?

A. You're getting ahead of yourself.

Q. Well, I'm just—if you would, answer the question.

. . . .

Q. Where was it you'd asked him [Emmett Hosey] that at?

A. You just asked me that awhile ago.

. . . .

A. [Y]ou know why that was an awful night?

Q. Yes, ma'am, I do.

A. You wasn't even there, so how could you know?

Q. The fact is, Mrs. Hosey, you weren't in the room when Emmitt went in there, were you, yourself?

. . . .

Q. I'll ask you, Mrs. Hosey, on the night you went over to Mr. Martin's right here, if you didn't make a statement in their presence that you believed everything [the victim] had said that day and that you were mighty upset about it. Didn't you tell them that?

A. I believed it at the time.

. . . .

Q. Mrs. Hosey, when did you stop believing it?

A. Right after [the victim] didn't know what come was, when I got to thinking about she didn't know, and she does know. She knows a lot more than she lets on like she does.

Q. Mrs. Hosey, I believe you said—correct me if I'm wrong. I want to be sure I'm straight about this—that right after she accused Emmitt is when you asked her what come was and she said she didn't know. Isn't that right?

A. I didn't ask her what come was.

Q. Well, didn't you testify that you asked her that right after . . .

A. No, I did not.

Q. When did you ask her that?

A. I didn't tell you that.

Q. You asked her did he come on you.

A. I said did he come on you.

Q. And right after she accused him of that. Is that right?

A. Yes, uh huh.

The State was frequently forced, in effect, to cross-examine its own witness in order to elicit complete and accurate answers. Mrs. Hosey's failure to be candid and forthcoming when initially answering many of the prosecutor's questions is further demonstrated by the following:

Q. Who did you find to be in the bedroom?

A. He [Emmett Hosey] wasn't in there.

Q. Had he been in there, to your knowledge?

A. Not to my knowledge but, well, I said, I didn't see him, and I . . .

A. [The victim] hollered, Mama. That's when I went up the hall, and Emmitt was standing there; and I said, Emmitt, did you go in there, and he said, well, yes, I went in there and covered them up.

State v. Hosey

Q. So, that's my question—yes, you know he went in there.

. . . .

Q. Mrs. Hosey, did I understand you to say just before this that [the victim] only came to see you [in the hospital] two times? Is that right?

A. Two times with Emmitt.

Q. I'll ask you if you didn't say she just came two times.

A. She came four times.

Q. And when did you decide it was four times, Mrs. Hosey?

. . . .

Q. I'll ask you whether or not when you went over there you begged and pleaded with [the victim] to drop all this.

A. No, buddy, I did not beg and plead.

Q. Did you ask her to drop it?

A. . . . I said . . . ain't you got what you wanted, and she said yes. I said why in the world don't you stop this mess.

Q. So you did ask her to stop it.

A. Yeah. I said why in the world don't you stop this mess.

Mrs. Hosey's cooperation with the State during direct examination was, at best, minimal. The record on appeal makes it obvious that Mrs. Hosey was only ostensibly a State's witness.

The Commentary[2] to Rule 611 is helpful in determining when an objection to a leading question by a party cross-examining a friendly witness should be sustained. It reads in relevant part:

2. The commentaries printed with the North Carolina Rules of Evidence, N.C.G.S. § 8C-1, in the General Statutes were not enacted into law by the General Assembly. Instead, the General Assembly intended that the commentaries be used to "clarify legislative intent or reflect amendments to the rules . . ." and instructed the Revisor of Statutes to "cause the Commentary to each rule to be printed with

Subdivision (c) continues the traditional view that the suggestive powers of the leading question are as general propositions undesirable. Within this tradition numerous exceptions have achieved recognition: . . . . As the Advisory Committee's Note points out: "The matter clearly falls within the area of control by the judge over the mode and order of interrogation and presentation and accordingly is phrased in words of suggestion rather than command."

The Note states that:

"The rule also conforms to tradition in making the use of leading questions on cross-examination a matter of right. The purpose of the qualification 'ordinarily' is to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact, as for example the 'cross-examination' of a party by his own counsel after being called by the opponent (savoring more of redirect) or of an insured defendant who proves to be friendly to the plaintiff."

N.C.G.S. § 8C-1, Rule 611, Commentary (Cum. Supp. 1985).

While the use of leading questions ordinarily is a matter of right during cross-examination, the defendant here clearly was cross-examining a friendly witness. Therefore, the defendant was engaged in cross-examination in form only and not in fact. Justifiable concern has been expressed that to allow a party to ask leading questions of a friendly witness "would allow the examiner to provide a false memory to the witness by suggesting the desired reply to his question." *State v. Greene,* 285 N.C. at 492, 206 S.E. 2d at 235.

[1] Like the authors of the Commentary, we conclude that the qualification "ordinarily" used in subsection (c) of Rule 611 "is to furnish a basis for denying the use of leading questions when the

the rule in the General Statutes." 1983 N.C. Sess. Laws ch. 701, § 2. This approach by the General Assembly was prudent, since the commentaries contain references to case law of other states and other matters subject to change without the consent or knowledge of the General Assembly. In accord with what we perceive to be the intent of the General Assembly, we will not treat the commentaries printed with the North Carolina Rules of Evidence in the General Statutes as binding authority but, instead, will give them substantial weight in our efforts to comprehend legislative intent.

cross-examination is cross-examination in form only and not in fact . . . ." N.C.G.S. § 8C-1, Rule 611(c), Commentary (Cum. Supp. 1985). Further, the authority to sustain objections to leading questions directed to friendly witnesses in such situations is inherent in the discretion granted the trial court in Rule 611 to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . make the interrogation and presentation *effective for the ascertainment of the truth.*" N.C.G.S. § 8C-1, Rule 611(a) (Cum. Supp. 1985) (emphasis added). The exercise of this discretionary power by the trial court at appropriate times will prevent the party examining a friendly witness from providing "a false memory to the witness by suggesting the desired reply to his question" inadvertently or otherwise. *State v. Greene,* 285 N.C. at 492, 206 S.E. 2d at 235. When a party is "cross-examining" a friendly witness, it is within the discretion of the trial court to sustain objections to leading questions.

[2]   The defendant also contends that it was improper for the trial court to limit or prevent him from asking leading questions on cross-examination without first making formal findings and conclusions and declaring the witness hostile to the State or friendly to the defendant. No such declaration was made by the trial court in this case.

By his argument in this regard, the defendant has sought to have us require formal findings analogous to those we previously required under our former anti-impeachment rule. Under that rule, the State was prohibited from impeaching its own witness by prior inconsistent statements or any evidence of the witness's bad character. *See, e.g., State v. Cope,* 309 N.C. 47, 305 S.E. 2d 676 (1983). An exception to the general rule applied when the prosecutor had been misled as to the witness's expected testimony on a material fact and was "surprised by the actual testimony given." Before the trial court could apply the "surprise exception," however, it was required to resolve in a *voir dire* hearing the preliminary questions of whether the prosecutor had been misled and surprised by the testimony of the witness. *Id.* at 51, 305 S.E. 2d at 679.

The anti-impeachment rule and exceptions thereto were abolished with the adoption of our new North Carolina Rules of

Evidence. *State v. McDonald*, 312 N.C. 264, 269 n.1, 321 S.E. 2d 849, 852 n.1 (1984). Rule 607 now expressly provides that "[t]he credibility of a witness may be attacked by any party, including the party calling him." N.C.G.S. § 8C-1, Rule 607 (Cum. Supp. 1985).

We see no reason to engraft the technical requirements for exceptions to the now abolished anti-impeachment rule to issues arising under Rule 611 of the North Carolina Rules of Evidence. The better practice in cases such as this would be for the trial court to make findings and conclusions and declare formally that the witness is friendly to the party cross-examining him or adverse to the party calling him as a witness. *Cf. State v. Tate*, 307 N.C. 242, 297 S.E. 2d 581 (1982) (decided prior to the effective date of the North Carolina Rules of Evidence). But when, as here, the record on appeal manifestly shows that the witness was only ostensibly the witness of the party calling her and was entirely friendly to the party cross-examining her, the trial court does not commit reversible error by failing to make such a formal declaration. A trial court may properly limit leading questions of a witness in such situations without conducting a *voir dire* hearing or making any formal declaration.

[3] The defendant was not denied his right to cross-examine adverse witnesses or his right to present a full and effective defense. The trial court did not err in the present case by sustaining the State's objections to leading questions asked of a witness only nominally adverse to the defendant.

Further, any possible error in this regard was rendered harmless, because the defendant had the opportunity to establish any material fact he sought to elicit by simply rephrasing his questions to Mrs. Hosey. That he in fact did so is amply illustrated by the following:

Q. Was [the victim] very upset and mad about it [a disagreement with Emmett Hosey] at the time?

A. Yes.

Q. All right, now, let me ask you this. Do you recall some time after that, more particularly on May 4, 1984, did [the victim] leave the trailer on that day where y'all were living?

State v. Hosey

A. Yes.

Q. And did she leave some time around the hour of 12:30 A.M.?

MR. YEATTS: OBJECTION.

MR. BOWMAN: To leading, Your Honor.

MR. YEATTS: OBJECTION to leading and OBJECTION to relevancy.

COURT: Well, SUSTAINED to the leading and without further foundation, I will SUSTAIN it as to relevancy.

Q. What time did [the victim] leave at that time?

A. 12:30.

. . . .

Q. Has she [the victim] ever told you at any time that — let me ask you this. Did you ask her about telling stories on . . .

MR. BOWMAN: OBJECTION to leading, Your Honor.

COURT: SUSTAINED.

Q. What if anything, did you ask her in regards to telling you the truth about things?

MR. BOWMAN: OBJECTION.

COURT: On what gounds [sic]?

MR. YEATTS: On the grounds of leading, Your Honor.

COURT: OVERRULED.

Q. What did you ask her?

A. [The victim] told me not to tell nobody that April's boyfriend had bought her a house.

. . . .

Q. Did he [Emmett Hosey] get up during the night and go do something with the furnace?

A. Yes, he did.

Q. Now, was it cool . . .

MR. BOWMAN: OBJECTION to leading.

COURT: SUSTAINED.

Q. Tell the ladies and gentlemen of the jury whether or not it was cool or warm that night.

A. Yes, it was cool and he got up to light our furnace.

Q. Did the heat come on?

MR. YEATTS: OBJECTION to leading, Your Honor.

COURT: SUSTAINED.

Q. State whether or not the heat came in or not.

A. Yes.

. . . .

Q. Now, Mrs. Hosey, let me ask you this. Did you say that the first time [the victim] told you something about this incident back in September of 1981 was during Autumn Leaves Festival?

A. Yes.

Q. Did she tell you then that it had been, that it happened two or three days after you'd gone into the hospital?

A. She said he [Emmett Hosey] touched her.

Q. I know, but did she tell you that it happened two or three days after you had gone in the hospital?

MR. BOWMAN: OBJECTION to the leading, Your Honor.

COURT: SUSTAINED.

Q. Did she tell you anything about when it happened?

A. No.

Thus, it is readily apparent that the action of the trial court in sustaining objections to leading questions during the defendant's cross-examination of his wife did not significantly interfere with the defendant's exercise of his right to cross-examine her. We reject the defendant's first contention as being without merit.

We have reached the same result as the Court of Appeals with regard to this contention. However, the opinion of the Court of Appeals may be read as expressing the view that, in all situations:

> it is within the sound discretion of the trial judge to determine whether the use of leading questions will be permitted and absent an abuse of such discretion the ruling by the trial judge will not be disturbed on appeal. *State v. Greene*, 285 N.C. 482, 492, 206 S.E. 2d 229, 235 (1974).

*State v. Hosey*, 79 N.C. App. 196, 202, 339 S.E. 2d 414, 417 (1986). The rule quoted from *Greene* and relied upon by the Court of Appeals in this case is not universally valid. The trial court's discretion in this regard is limited to some extent by Rule 611. Nevertheless, for reasons fully discussed in this opinion, the Court of Appeals was correct in concluding that the trial court did not err by sustaining objections to the defendant's leading questions of Mrs. Hosey.

The defendant brought forward several additional assignments of error and supporting contentions. He contends he was denied a fair trial because the State asked questions insinuating he had engaged in criminal acts when his character was not at issue. He also contends that the trial court erred by denying his motion to dismiss the rape charge for lack of substantial evidence of each of the elements of the offense. Finally, he contends the trial court committed plain error by including a statement not supported by the evidence during its review of the evidence for the jury. Each of these contentions was addressed and disposed of in the opinion of the Court of Appeals in this case. For the reasons fully articulated in the opinion of the Court of Appeals, these assignments and contentions are without merit.

The decision of the Court of Appeals as modified herein is affirmed.

Modified and affirmed.