420 S.E.2d 541

**Michael RINE, an Infant and Incompetent, By and Through his Mother, Natural Guardian and Next of Friend, Traci L. RINE, and Traci L. Rine, Individually, Plaintiffs Below, Appellants,**

v.

**Oscar S. IRISARI, M.D., Defendant Below, Appellee.**

**No. 20459.**

Supreme Court of Appeals of West Virginia.

Submitted April 28, 1992.

Decided June 11, 1992.

Robert P. Fitzsimmons, William E. Parsons, Fitzsimmons & Parsons, and Gregory A. Gaudino and William G. Petroplus, Petroplus & Gaudino, Wheeling, for appellants.

Herbert G. Underwood, Steptoe & Johnson, Clarksburg, for appellee.

McHUGH, Chief Justice:

The appellants, Michael Rine, an infant, and his mother, Traci L. Rine, appeal from a jury verdict entered in a medical malpractice action in the Circuit Court of Marshall County in favor of Oscar S. Irisari, M.D., an obstetrician. Upon review of the record before us, we conclude that this case should be remanded for a new trial.

I

Ms. Rine employed Dr. Irisari to treat her during her pregnancy in 1983. Dr. Irisari was specializing in obstetrics [1] and practicing in a partnership with his wife, Elisa Irisari, M.D. Ms. Rine was first examined by Dr. Irisari on January 10, 1983, and the expected date of the birth of her child was August 8, 1983. She continued regular office visits with Dr. Irisari until June of 1983.

On June 24, 1983, Ms. Rine experienced premature labor and was admitted to Reynolds Memorial Hospital.[2] Dr. Irisari initially attempted to stop Ms. Rine's labor with medication. Dr. Irisari did not use an electronic fetal heart monitor to determine fetal distress. Moreover, Dr. Irisari did not transfer Ms. Rine to a "high-risk" facility for labor and delivery. Michael Rine was born prematurely at Reynolds Memorial Hospital on June 25, 1983.

A few seconds after his birth, Michael stopped breathing. James Edward Goodwin, M.D., the pediatrician selected to be Michael's doctor upon birth, attempted to resuscitate Michael by intubating him. Two and one-half hours later, a team from West Virginia University arrived at Reynolds Memorial Hospital and had to reintubate Michael because the tube was placed in his esophagus instead of his trachea. The record indicates that Dr. Goodwin did not have privileges at Reynolds Memorial Hospital to care for premature infants experiencing complications.

Now, at eight years of age, Michael has severe to profound mental retardation, severe developmental delays, cerebral palsy, left hemiplegia, grand mal and petit mal seizures, attention deficit with hyperactivity, no meaningful speech, and aggressive behavior which is sometimes self-abusive. Michael is currently functioning at the level of a one-year-old child.

Ms. Rine filed a medical malpractice action against Dr. Irisari based on the theory that Dr. Irisari was negligent in failing to transport Ms. Rine to a high-risk medical facility, in failing to use an electronic fetal heart monitor, in failing to monitor Ms. Rine's labor and fetus,[3] and in failing to organize an adequate resuscitation team. Ms. Rine alleges that Dr. Irisari's negligence caused or contributed to Michael's injuries.[4]

---

1. Dr. Irisari testified that he failed the exam for board certification in the specialty of obstetrics in 1979, and as a result, he was not board certified in 1983.

2. Reynolds Memorial Hospital was not equipped with a neonatal intensive care unit.

3. At trial, the appellants showed that none of the hospital records indicate that Dr. Irisari checked on Ms. Rine from 12:30 a.m. until 6:11 a.m., although Dr. Irisari testified he did. Ms. Rine began experiencing contractions again at 3:00 a.m., which became moderate by 4:00 a.m. Dr. Irisari testified in a deposition that had he known she was experiencing moderate contractions at 4:00 a.m., he would have transferred her to West Virginia University Hospital. However, at trial, he testified that she was not experiencing active labor at that time, and that when active labor did begin, it was too late to transfer her.

4. Ms. Rine had also made allegations of negligence against Reynolds Memorial Hospital, James Edward Goodwin, M.D., Jose J. Ventosa, Jr., M.D., and Martin Scheinholtz, M.D. regarding the resuscitation procedures. Those parties, however, reached a settlement with the appellants.

A six-day trial was held before a jury in November of 1990, and at the conclusion, the jury returned a verdict in favor of Dr. Irisari. The appellants now seek to have the jury verdict and judgment set aside, and a new trial awarded.

## II

■ One issue raised in this case which has not previously been addressed by this Court is whether the negligence of subsequent treating physicians, if such negligence may be foreseen, is chargeable to the original medical tortfeasor. The judge in the present case refused the jury instruction offered by the appellants regarding a negligent physician's liability for subsequent negligent medical treatment which is undertaken to mitigate the harm caused by the original physician's own negligence.

The appellants' theory of the case was that Dr. Irisari was responsible, not only for his own negligence in treating Ms. Rine, but also for the negligence of subsequent treating physicians which would have been foreseeable. Such a theory is consistent with the rule stated in section 457 of the *Restatement (Second) of Torts* (1965), which provides:

If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or a negligent manner.

Many courts have recognized the rule that, in cases of successive malpractice, the original medical tortfeasor is liable for subsequent negligent medical treatment which is undertaken to mitigate the harm caused by the original medical tortfeasor. *Daly v. United States*, 946 F.2d 1467 (9th Cir.1991); *Cokas v. Perkins*, 252 F.Supp. 563 (D.C. 1966); *Davidson v. Gaillard*, 584 So.2d 71 (Fla.Dist.Ct.App.1991); *Carter v. Shirley*, 21 Mass.App. 503, 488 N.E.2d 16 (App.Ct. 1986); *Naccarato v. Grob*, 384 Mich. 248, 180 N.W.2d 788 (1970); *Lindquist v. Dengel*, 92 Wash.2d 257, 595 P.2d 934 (1979). *See also Gilson v. Mitchell*, 131 Ga.App.

321, 205 S.E.2d 421 (1974), *aff'd*, 233 Ga. 453, 211 S.E.2d 744 (1975); *Alberstett v. Country Mutual Insurance Co.*, 79 Ill. App.3d 407, 34 Ill.Dec. 788, 398 N.E.2d 611 (1979); *Sall v. Ellfeldt*, 662 S.W.2d 517, 525 n. 4 (Mo.Ct.App.1983); *Incollingo v. Ewing*, 444 Pa. 263, 299, 282 A.2d 206 (1971); *Corbett v. Clarke*, 187 Va. 222, 46 S.E.2d 327 (1948).

In *Lindquist v. Dengel*, the Washington Supreme Court found that

where malpractice results in an injury for which a physician is liable, the risk created includes that of additional medical treatment and, perhaps, additional harm. There is no reason in principle to create a special exception to the rule of liability for harm which is foreseeable and within the scope of the risk merely because the tort-feasor is a physician.

595 P.2d at 937. In reaching this decision, the court relied on the basic rule of liability for harm resulting from treatment of injuries caused by a tortfeasor's negligent conduct which is stated in *Restatement (Second) of Torts* § 457 (1965).

The Ninth Circuit recently clarified the rule stated by the Washington Supreme Court in *Lindquist*. The Ninth Circuit pointed out, in *Daly v. United States*, that "[t]he relationship between the harm inflicted by the first physician and the treatment initiated by the second is crucial to holding the first physician liable for subsequent malpractice." 946 F.2d at 1471. The court stated that section 457 of the *Restatement (Second) of Torts* (1965) "applies only when the subsequent treatment is undertaken to mitigate harm inflicted by a prior physician." *Id.*

The District Court of Appeal of Florida addressed the issue of the foreseeability of the subsequent negligent treatment in *Davidson v. Gaillard, supra.* That court also cited section 457 of the *Restatement (Second) of Torts* (1965) and recognized that "[t]he rationale for this rule is that negligent medical treatment is within the scope of the risk created by the original negligent conduct." 584 So.2d at 73. The court also observed that when an original tortfeasor's negligent act causes a plaintiff

to seek medical treatment which is negligently provided, such negligent medical treatment is foreseeable *as a matter of law. Id.* However, the court acknowledged that if the nature of the subsequent negligent treatment is "highly unusual, extraordinary or bizarre," such negligence would be unforeseeable as a matter of law. 584 So.2d at 74.

Finally, the Appeals Court of Massachusetts, in *Carter v. Shirley*, also found that the rule stated in the *Restatement (Second) of Torts* § 457 (1965) should apply to "physicians whose original negligence causes the intervention of a second physician who either improperly diagnoses the case and performs an unnecessary operation or makes a proper diagnosis and performs a necessary operation negligently." 488 N.E.2d at 20.

Although we have never addressed this issue in a case involving successive malpractice, this Court has recognized that a person who negligently causes personal injuries is liable for increased damages due to the negligence of a physician who treats and aggravates the original injury when the injured person exercises reasonable care in selecting the physician. Syl. pt. 1, *Mier v. Yoho*, 114 W.Va. 248, 171 S.E. 535 (1933), *overruled on another point*, syl. pt. 4, *Thornton v. Charleston Area Medical Center*, 158 W.Va. 504, 213 S.E.2d 102

(1975).[5] We observed that the reason given for this rule "is that the aggravation caused by the negligent or unskillful treatment by a physician of the original injury would not have occurred if there had been no original injury[.]" *Makarenko v. Scott*, 132 W.Va. 430, 441, 55 S.E.2d 88, 93–94 (1949), *overruled on another point*, syl. pt. 4, *Thornton v. Charleston Area Medical Center*, 158 W.Va. 504, 213 S.E.2d 102 (1975) and syl. pt. 1, *Jones v. Laird Foundation, Inc.*, 156 W.Va. 479, 195 S.E.2d 821 (1973).

There appears to be no reason not to apply this rule to a physician whose original negligence causes the intervention of a second physician who is also negligent. Therefore, we hold that a negligent physician is liable for the aggravation of injuries resulting from subsequent negligent medical treatment, if foreseeable, where that subsequent medical treatment is undertaken to mitigate the harm caused by the physician's own negligence.

■ Upon reviewing the jury instructions in the present case, we do not find that the jury was properly instructed on the appellants' theory of Dr. Irisari's liability for subsequent negligent medical treatment.[6] The judge's charge[7] which included the jury instructions,[8] did not adequately cover the appellants' theory of Dr. Irisari's liability for foreseeable subsequent

---

**5.** For a recent decision involving set off or verdict credit in cases involving successive and independent tortfeasors, see *Pennington v. Bluefield Orthopedics, P.C.*, 187 W.Va. 344, 419 S.E.2d 8 (1992).

**6.** Although the trial judge did not adequately instruct the jury regarding the issue of Dr. Irisari's *liability* for subsequent negligent medical treatment, the trial judge did instruct the jury regarding the damages for such negligent medical treatment:

> If you find for the plaintiffs on the issue of liability, then in assessing damages against the defendant, you may include in your verdict an amount for the damages, if any, which you find resulted from subsequent negligent medical treatment rendered by physicians other than the defendant in caring for the injuries caused by the defendant's negligence so long as you find that the plaintiffs exercised ordinary care in selecting such subsequent physicians.

**7.** In her charge to the jury, the trial judge stated: "You are instructed that if any negligent act by the defendant increased the risk of harm or injury to Michael Rine and the increased risk of harm was a substantial factor in causing injury and damages to him, then Defendant Irisari is liable for such injuries and damages."

**8.** The trial court gave Dr. Irisari's Instruction No. 5, and read it to the jury as follows:

> [I]f you believe from a preponderance of the evidence that the alleged injuries to Michael Rine occurred only as a consequence of the intubation performed by Dr. Goodwin or Dr. Sheinholtz immediately following his birth and in the presence and with the acquiescence of Dr. Ventosa and Dr. Sheinholtz, and that the medical care and treatment was necessary as a consequence of Michael Rine's prematurity and if you find that the intubation was negligent and not due to any negligence on the part of Dr. Irisari, then you must fin[d] for the Defendant, Oscar S. Irisari.

negligent treatment. Thus, because the jury was not fully instructed on all the principles that applied to the case, we conclude that the refused instruction should have been given.[9]

## III

The appellants next contend that the trial court erred in refusing to strike two jurors for cause. One juror, Alice Okel, was employed as a licensed practical nurse at Reynolds Memorial Hospital, which was one of the defendants in the case. The other juror, William Brown, owned a grocery store across the street from Dr. Irisari's office. Dr. Irisari maintains that the qualifications of both jurors were within the sound discretion of the trial court, and that there was no abuse of that discretion warranting a new trial.

The record shows that Ms. Okel was employed as a licensed practical nurse at Reynolds Memorial Hospital,[10] knew of Dr. Irisari and his wife, and had observed two surgeries performed by Dr. Irisari while she was training to become a nurse. Furthermore, while the court and counsel were conducting individual voir dire in chambers, it was learned that Ms. Okel and another prospective juror, Teri Dobbs, who was a patient of Dr. Irisari, had a conversation about Dr. Irisari's performance as a physician. Both admitted to the conversation upon being questioned by the trial court. Ms. Dobbs stated that she told Ms. Okel that Dr. Irisari was a good doctor and that she was "pleased with him." Ms. Dobbs was excused for cause. Ms. Okel, while being questioned by the court regarding the conversation, stated that, from what she knew of Dr. Irisari, "he seems alright to me."[11] The trial court did not, however, excuse Ms. Okel for cause.

The other juror, William Brown, at first indicated that he did not know Dr. Irisari. However, it later came out that Mr. Brown operated a grocery store across the street from Dr. Irisari's office, that Dr. Irisari's wife was one of his customers, and that Dr. Irisari and his wife were both good neighbors and customers. When asked whether he would be uncomfortable to see Dr. Irisari's wife at the grocery store if he awarded a verdict against her husband, Mr. Brown responded that "[i]t might be hard to look her in the eye when I saw her."

■ The appellants rely on *Davis v. Wang*, 184 W.Va. 222, 225, 400 S.E.2d 230, 233 (1990),[12] wherein we restated the test of a qualified juror: "The true test as to whether a juror is qualified to serve on the panel is whether without bias or prejudice he can render a verdict solely on the evidence under the instructions of the court." Syl. pt. 1, *State v. Wilson*, 157 W.Va. 1036, 207 S.E.2d 174 (1974).

■ Although we recognized in *Davis* that the decision to grant a motion to strike a juror for cause is within the discretion of the trial court, we also explained how that discretion must be balanced:

[T]he discretion granted the trial court in striking jurors for cause must be balanced against our determination, after the fact, of whether the potential jurors were sufficiently biased so as to prevent a fair trial. This Court has concluded

---

9. Appellant's jury instruction number 25, which was refused, states:

You are instructed that if you find Defendant Oscar Irisari negligent, then it is not a defense for him nor can he avoid liability for aggravation of the injuries caused by medical personnel who later negligently treated Michael Rine for the injuries he received as a result of the original negligence of Defendant Oscar Irisari.

Any reduction in the amount of damages as a result of other persons' negligence, if any, will be done by me, if the law so provides, after the verdict. It is therefore important that you assess the total amount of damages, if any, according to these instructions.

10. During voir dire, Ms. Okel, when asked whether she would be influenced by the fact that the appellants had sued her employer, stated that "I guess it would because they [sic] are my employer, and I would have to stand behind my employer." She then stated that it would not influence her against either Dr. Irisari or the appellants.

11. Ms. Okel also acknowledged that her daughter had been a patient of Dr. Irisari's wife.

12. We note that, in *Davis*, we also observed that "[w]ithout a meaningful and effective voir dire, a fair trial is not possible." 184 W.Va. at 225, 400 S.E.2d at 233.

that 'the mere statement of a prospective juror that he or she is not biased with respect to a particular cause may not be sufficient for the trial court to conclude that no such bias exists.'

*Id.*

We further stated, in *Davis*, reaffirming our earlier holding in *State v. West*, 157 W.Va. 209, 200 S.E.2d 859 (1973), that "[a]ny doubt the court might have regarding the impartiality of a juror must be resolved in favor of the party seeking to strike the potential juror." 184 W.Va. at 226, 400 S.E.2d at 234.

In the case now before us, although Ms. Okel and Mr. Brown both represented to the trial court that they each believed they could reach a verdict based solely on the evidence and the instructions, certain statements made by each of them brought their impartiality into doubt. The mere statements by both of these jurors to the effect that they would not be biased were not sufficient for the trial court to conclude that no bias existed, given their other statements about Dr. Irisari and his wife.[13] In accordance with *Davis, supra*, any doubt regarding the impartiality of Ms. Okel and Mr. Brown should have been resolved in favor of the appellants who were seeking to strike them from the jury for cause. Thus, we agree with the appellants that cause existed to strike Ms. Okel and Mr. Brown from the jury. Accordingly, we find that the trial court abused its discretion.

### IV

The appellants also object to the use of the deposition of a non-witness, non-party who was "available" to testify. The appellants maintain that counsel on behalf of Dr. Irisari had to show the unavailability of the witness, who is Ms. Rine's sister, before the deposition could be used. The appellants point out that the condition of the infant at birth was a crucial issue to be decided by the jury, and that the reference to the deposition of Ms. Rine's sister,

wherein she stated that the infant's coloring was basically normal at birth, was prejudicial. Dr. Irisari argues that the use of that deposition testimony in cross-examination was not error.

■ Rule 804(b)(1) of the *West Virginia Rules of Evidence*, the exception to the hearsay rule which is relevant to the present case, provides:

(b) *Hearsay Exceptions.*—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former Testimony.—Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

As a condition precedent to the admissibility of evidence under the hearsay rule exceptions of *W.Va.R.Evid.* 804, the proponent of the evidence must show proof of the unavailability of the declarant. 11 James Wm. Moore & Helen I. Bendix, *Moore's Federal Practice* § 804.02 (1989); 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* § 804(a)[01] (1991). The definition for the "unavailability of a witness" is found in Rule 804(a) of the *West Virginia Rules of Evidence:*

**Rule 804. Hearsay Exceptions; Declarant Unavailable.** (a) *Definition of Unavailability.*—'Unavailability as a witness' includes situations in which the declarant—

(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement; or

(2) persists in refusing to testify concerning the subject matter of his state-

---

**13.** The purpose of voir dire is to identify those jurors " 'who are not only free from prejudice, but who are also free from the suspicion of prejudice.' " *State v. Matney*, 176 W.Va. 667, 671, 346 S.E.2d 818, 822 (1986).

ment despite an order of the court to do so; or

(3) testifies to a lack of memory of the subject matter of his statement; or

(4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

(5) is absent from the hearing and the proponent of his statement has been unable to procure his attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), his attendance or testimony) by process or other reasonable means. A declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying.

As a general rule, it is within the discretion of the trial court to decide whether the proof of the witness' unavailability is sufficient. *Barrett v. Asarco Inc.*, 245 Mont. 196, 799 P.2d 1078, 1082 (1990); *Williams v. A–Treat Bottling Co., Inc.*, 380 Pa.Super. 195, 551 A.2d 297, 300 (1988).

There is a preference to have the witness available to testify in open court. The United States Supreme Court explained this preference in *United States v. Inadi*, 475 U.S. 387, 394, 106 S.Ct. 1121, 1126, 89 L.Ed.2d 390, 398 (1986):[14]

Unlike some other exceptions to the hearsay rules, or the exemption from the hearsay definition involved in this case, former testimony often is only a weaker substitute for live testimony. It seldom has independent evidentiary significance of its own, but is intended to replace live testimony. If the declarant is available and the same information can be presented to the trier of fact in the form of live testimony, with full cross-examination and the opportunity to view the demeanor of the declarant, there is little justification for relying on the weaker version. *See* 2 John William Strong, *McCormick on Evidence* § 301, at 304 & n. 6 (4th ed. 1992). *See also City of Indianapolis v. Parker*, 427 N.E.2d 456, 462 (Ind.Ct.App. 1981) (the policy favoring personal presence requires that a showing of unavailability be made before the testimony of a witness at a former trial may be introduced at a subsequent trial).

Therefore, based on the discussion above, we hold that as a condition precedent to the admissibility of former testimony under *W.Va.R.Evid.* 804(b)(1), the proponent of such testimony must show the unavailability of the witness. If the witness is available, the in-court testimony of that witness is preferred.

 In the case before us, the deposition of Ms. Rine's sister, Cindi Bougher, was used by defense counsel to ask the appellants' neurological expert, Charles Poser, M.D., whether he was advised that her deposition was part of the record in the case.[15] Defense counsel then used the deposition to question Ms. Rine as to whether she knew that her sister's testimony regarding the birth of Michael was contrary to her own. The appellants' counsel object-

---

**14.** In *Inadi,* the defendant was convicted of conspiring to manufacture and distribute methamphetamine, and related offenses. At trial, the defendant attempted to exclude the tape recorded statements of the co-conspirators on the ground that those statements did not meet the requirements of Rule 801(d)(2)(E) of the *Federal Rules of Evidence* governing admission of co-conspirator declarations. The Supreme Court held that the confrontation clause did not require showing the unavailability of the declarant as a condition to admission of out-of-court statements of nontestifying co-conspirators.

**15.** In his question to Dr. Poser, counsel on behalf of Dr. Irisari read part of Ms. Bougher's deposition:

Doctor, were you advised that in the course of evaluating this case and arriving at your conclusions that Ms. Cindi Bougher, a nurse and sister of Traci Rine, had testified with regard to the child; he was taken over and put on the warming lights. Kathy and Dr. Goodwin were working with him, and I remember Dr. Goodwin saying something about—I don't recall. I don't think he said, he must have said respiratory arrest. I don't recall exactly, but it was something to the effect that the baby was not breathing as it should be. That was my end of contact with the baby at that time.

ed on the grounds that the testimony was hearsay and that defense counsel had failed to show Ms. Bougher was unavailable to testify. Defense counsel then represented to the court that he was going to attempt to bring Ms. Bougher in to testify,[16] and he did not indicate that she was unavailable to testify. Defense counsel, however, never called Ms. Bougher as a witness.

Although Dr. Irisari argues that the deposition was not being offered to show the truth of the matter asserted, it is apparent that it was being offered to show Michael's condition at birth, a key issue in this medical malpractice action. Furthermore, there is nothing in the record which indicates that Ms. Bougher was unavailable to testify. Therefore, we find that, under *W.Va. R.Evid.* 804, this deposition should not have been used because there was no indication that the witness was unavailable and the introduction of the hearsay testimony was prejudicial to the appellants.

### V

■ The final issue we shall address involves the appellants' assertion that defense counsel should not have been allowed to ask leading questions of Dr. Irisari when he was called as an adverse witness by the appellants. Dr. Irisari argues that, although appellants' counsel objected at first to leading questions,[17] counsel failed to re-

new the objection and therefore, waived any error on appeal.

*W.Va.R.Evid.* 611(c) governs the use of leading questions on direct examination and cross-examination:

(c) *Leading Questions.*—Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. Ordinarily, leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, a witness identified with an adverse party, or an expert witness, interrogation may be by leading questions.

This Court has recognized the right, under *W.Va.R.Evid.* 611, to call an adverse party and interrogate that party by leading questions. Syl. pt. 1, *Gable v. Kroger Co.,* 186 W.Va. 62, 410 S.E.2d 701 (1991). We have also recognized that the trial court has discretion under Rule 611(a) to exercise reasonable control over the mode of cross-examining witnesses. Syl. pt. 2, *Gable, supra.* However, we have yet to address the issue of whether leading questions may be asked of an adverse witness on cross-examination, where the adverse party himself has been called as a witness by the opponent and the cross-examination being conducted by the adverse party's own counsel is cross-examination in form only and not in fact.

---

**16.** When defense counsel attempted to question Ms. Rine about her sister's testimony, the following exchange took place:

MR. FITZSIMMONS: Judge, there is no testimony. Are you going to call her, Mr. Underwood?

THE COURT: Is there going to be testimony here?

MR. FITZSIMMONS: Are you going to attempt to bring her in?

MR. UNDERWOOD: I expect to, yes, if I can find her.

MR. FITZSIMMONS: Well, let's bring her in and let her testify then.

THE COURT: Well, this has come up on two or three other occasions.

MR. FITZSIMMONS: That's a deposition and that's hearsay until—

THE COURT: Wait. Let's come up here. (Discussion held at the bench out of the hearing of the jury.)

THE COURT: It's been used two or three times before.

MR. FITZSIMMONS: It's hearsay.

THE COURT: It's from the deposition but it's not intended—I thought that someone intended to bring her in here to testify.

MR. FITZSIMMONS: Mr. Underwood has her listed as a witness, but he can't represent that there is testimony. That's hearsay.

Mr. Fitzsimmons then explained to the court that

[T]he only way you can use a deposition, Judge, is if ... there is an unavailability of the witness. He has not shown the unavailability of the witness and when he does, then he can use the deposition. It's use in this situation is not permitted under the rules and it's hearsay.

The court, however, overruled the objection.

**17.** The trial court overruled the objection.

Although leading questions are permitted on cross-examination, there are exceptions where leading questions should be limited or prohibited on cross-examination. *W.Va.R.Evid.* 611(c) and Rule 611(c) of the *Federal Rules of Evidence* [18] both include the qualification "ordinarily" in their reference to the use of leading questions on cross-examination to provide for those exceptions. The Advisory Committee's Note to *Fed.R.Evid.* 611(c) explains the purpose of the qualification "ordinarily":

> The rule also conforms to tradition in making the use of leading questions on cross-examination a matter of right. The purpose of the qualification 'ordinarily' is to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact, *as for example the 'cross-examination' of a party by his own counsel after being called by the opponent (savoring more of re-direct)* or of an insured defendant who proves to be friendly to the plaintiff.

(emphasis added)

The rationale for limiting the use of leading questions on cross-examination where the adverse party or a witness favorable to him has been called by his opponent is that a friendly or pliant witness may follow the suggestion of the interrogator as to the desired answer. *Ellis v. City of Chicago*, 667 F.2d 606, 612 (7th Cir.1981); *Harris v. Buxton T.V., Inc.*, 460 So.2d 828, 832 (Miss. 1984); *State v. Hosey*, 318 N.C. 330, 348 S.E.2d 805, 810 (1986); 1 John William Strong, *McCormick on Evidence* § 6 (4th ed. 1992); 10 James Wm. Moore & Helen I. Bendix, *Moore's Federal Practice* § 611.31 (1988); 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* § 611[05] (1991).

In *Shultz v. Rice*, 809 F.2d 643 (10th Cir.1986), the Tenth Circuit ruled on the issue of whether, under *Fed.R.Evid.* 611(c), defense counsel could ask leading questions of the defendant doctor, after the doctor had been called as a witness by his opponent. The court found that the questioning of the defendant doctor by his own counsel on cross-examination "is precisely that characterized in the [advisory committee's] note [to Rule 611(c)] as 'cross-examination in form only and not in fact,' and therefore, should not have been allowed as a matter of right." 809 F.2d at 654. The court observed, however, that the preliminary questions defense counsel asked the defendant doctor related to undisputed facts. The court ultimately held that the leading questions asked the defendant doctor by his own counsel were "archetypical of those allowed during direct examination to develop testimony and expedite entry into evidence of time-consuming foundational information." 809 F.2d at 655.

In *State v. Hosey, supra,* the Supreme Court of North Carolina addressed the issue of asking leading questions to a friendly witness on cross-examination. In discussing the rule discouraging the use of leading questions when examining a friendly witness, the Court explained that "[j]ustifiable concern has been expressed that to allow a party to ask leading questions of a friendly witness 'would allow the examiner to provide a false memory to the witness by suggesting the desired reply to his question.'" 348 S.E.2d at 810 (citation omitted). The Court held that the qualification "ordinarily" included in Rule 611(c) "'is to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact[.]'" [19] *Id.* The Court also rec-

---

**18.** Rule 611(c) of the *Federal Rules of Evidence* provides:

> (c) *Leading Questions.* Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

*W.Va.R.Evid.* 611(c) has the same provision as the federal rule that *"ordinarily* leading questions should be permitted on cross-examination." (emphasis added)

**19.** For a review of older cases following this rule prior to the adoption of the federal and state rules of evidence, see Annotation, *Cross–Examination by Leading Questions of Witness Friendly to or Biased in Favor of Cross–Examiner*, 38 A.L.R.2d 952, at 3[b] (1954) (citing cases

ognized that inherent in the discretion granted to the trial court under Rule 611 is the discretion of the trial court to sustain objections to leading questions asked on cross-examination of a friendly witness. *Id.*

Thus, based on the foregoing reasoning, we hold that where the adverse party or a witness favorable to the adverse party is called as a witness by the opponent, leading questions by the adverse party's own counsel on cross-examination will usually not be allowed.

In the present case, although it appears that the questions to which the appellants' counsel objected at trial were leading,[20] those questions and Dr. Irisari's responses were substantially the same as those asked by appellants' counsel and answered by Dr. Irisari on direct.[21] However, because we intend to remand this case for a new trial, we caution counsel to avoid using leading questions under these circumstances.

## VI

Thus, for the reasons stated herein, we conclude that the jury verdict and judgment in this case should be reversed and this matter should be remanded for a new trial.[22]

Reversed and remanded.

---

where courts have refused to permit leading questions on cross-examination where the adverse party himself has been called as a witness by his opponent).

**20.** The appellants' counsel objected to the following questions defense counsel asked Dr. Irisari on cross-examination:

Q. Doctor, in 1983, regardless of the location, was there more than one type of fetal monitor?
A. Yes, there was.
Q. What were those types?
A. One was—you mean the manufacturer?
Q. No, sir. Was there an internal fetal monitor?
A. Internal and external fetal monitors. I thought that you wanted the manufacturer.
. . . .
Q. Excuse me, 1983. Doctor, did you order that the only fetal monitor available at Reynolds Memorial be applied to a patient of yours on June 24, 1983?
A. Yes, and when Traci came that patient was already in there. In my medical judgment that patient has more life threatening situation than Traci did.
Q. Was the patient to whom you ordered the electronic fetal monitor applied at Reynolds a high risk patient?
A. Yes.
Q. What was the nature of the high risk that involved that patient, Doctor?
A. She had severe preeclampsia to the point of being convulsive because her blood pressures were really high.
Q. Is that a significant medical problem to a mother, or a mother to be and the fetus?
A. Yes.

Q. Did you understand that this patient of yours was afflicted with a significant medical problem at that time?
A. Yes.
Q. Was it your decision from a medical standpoint to—
Appellants' counsel raised an objection at this point.

**21.** The following questions were asked by appellants' counsel and answered by Dr. Irisari on direct:

Q. So, you were managing three patients that night; one who was high risk that got the monitor, and Traci Rine who was also high risk and didn't get the monitor; is that a fair statement?
A. Yes.
Q. And you managed Traci's labor knowing that Traci and her baby were high risk without an available electronic fetal heart monitor from approximately 10:00 p.m. [o]n June 24 all the way until the time she gave birth at 6:49 a.m. on June 25; didn't you?
A. I recognized Traci as high risk, and the other patient that I was watching was in a life threatening situation, more high risk than Traci was.
Q. You testified that—
A. And I elected to put the monitor on that patient, and that patient came in a lot earlier than when Traci came.
Q. Right.

**22.** We find that the appellants' other two assignments of error involving the magnetic resonance film and report, and the denial of appellants' request to allow each juror to review the deposition of Dr. Irisari during impeachment questioning to be without merit. Therefore, we decline to address them in any detail.